SARA M. THORPE (SBN: 146529)
sthorpe@nicolaidesllp.com
TRACY S. ICKES (SBN: 317380)
tickes@nicolaidesllp.com
NICOLAIDES FINK THORPE
MICHAELIDES SULLIVAN LLP
101 Montgomery Street, Suite 2300
San Francisco, CA 94104
Telephone:   (415) 745-3770
Facsimile:   (415) 745-3771

Attorneys for Defendant
ASPEN SPECIALTY INSURANCE
COMPANY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| ESSEX WALNUT OWNER L.P., | Case No. 3:17-cv-06435-EMC |
|---|---|
| Plaintiff, | **ASPEN SPECIALTY INSURANCE COMPANY'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| ASPEN SPECIALTY INSURANCE COMPANY, | **Accompanying Documents:** Joint Statement of Undisputed Facts; Declaration of Gregory Kinzel; Proposed Order |
| Defendant. | |
| | Date:       July 27, 2018 |
| | Time:       1:30 p.m. |
| | Judge:      Hon. Edward M. Chen |
| | Complaint filed:  October 4, 2017 |
| | FAC filed:        October 5, 2017 |
| | Trial Date:       None Set |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on Friday, July 27, 2018, at 1:30 p.m., or as soon thereafter as this matter may be heard, in Courtroom 5 of the United States District Court, Northern District of California – San Francisco Division located at 450

Golden Gate Ave., San Francisco, California 94102, defendant Aspen Specialty Insurance Company ("Aspen") will move this Court for summary judgment against plaintiff Essex Walnut Owner, L.P. ("Essex") pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Essex seeks coverage under an Environmental Legal Liability Policy for the cost of redesigning a structural shoring system that supported the perimeter of an excavation.  As a matter of law, what Essex claims caused the original shoring system to fail is not a "pollution condition," and redesign of a shoring system is not a "clean-up cost."  No triable issue of fact exists and Aspen is entitled to judgment as a matter of law on all three causes of action of Essex's Complaint.

        This Motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities, Joint Statement of Undisputed Facts, Declaration of Greg Kinzel, the files and records in this lawsuit, and upon such other matters as may be presented to the Court prior to and at the time of the hearing.

Dated: June 22, 2018        NICOLAIDES FINK THORPE
                                        MICHAELIDES SULLIVAN LLP

                                By:      */s/ Tracy S. Ickes*
                                        Sara M. Thorpe
                                        Tracy S. Ickes
                                        Attorneys for Defendant Aspen Specialty
                                        Insurance Company

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................... 1

II. STATEMENT OF ISSUES TO BE DECIDED ..................................................... 2

III. UNDISPUTED MATERIAL FACTS ..................................................................... 2

    A. Essex's Construction Project and Initial Claim ........................................... 2

    B. The Revised Shoring System ...................................................................... 4

    C. The Aspen Policy ........................................................................................ 4

IV. LEGAL STANDARDS ............................................................................................ 6

    A. Summary Judgment .................................................................................... 6

    B. Interpretation of Insurance Policies ............................................................ 6

    C. A Duty to Indemnify Requires Actual, Not Merely Potential, Coverage ..... 8

V. ARGUMENT ............................................................................................................ 8

    A. There is No Coverage for Essex's Claim .................................................... 8

        1. Debris is Not a "Pollutant" ............................................................... 8

        2. Redesign of the Shoring System is Not a "Clean-Up Cost" .......... 10

        3. There is No Coverage for "Delay Costs" ...................................... 12

    B. Aspen Did Not Breach the Covenant of Good Faith and Fair Dealing .... 13

VI. CONCLUSION ....................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*AIU Ins. Co. v. Super. Ct.*,
  51 Cal. 3d 807 (1990) .................................................................................................. 6

*Bank of the West v. Super. Ct.*,
  2 Cal. 4th 1254 (1992) ................................................................................................. 7

*Buss v. Super. Ct.*,
  16 Cal. 4th 35 (1997) ................................................................................................... 8

*Coregis Ins. Co. v. Camico Mut. Ins. Co.*,
  959 F. Supp. 1213 (C.D. Cal. 1997) ............................................................................ 7

*Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.*,
  66 Cal. App. 4th 1080 (1998) .................................................................................... 13

*Flintkote v. Gen. Acc. Assur. Co.*,
  410 F. Supp. 2d 875 (N.D. Cal. 2006) ........................................................................ 6

*Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  18 Cal. 4th 857 (1998) ................................................................................................. 7

*GGIS Ins. Servs., Inc. v. Super. Ct.*,
  168 Cal. App. 4th 1493 (2008) .................................................................................... 7

*Guam Industrial Services, Inc. v. Zurich American Ins. Co.*,
  787 F.3d 1001 (9th Cir. 2015) ..................................................................................... 9

*Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*,
  59 Cal. 4th 277 (2014) ................................................................................................. 7

*Kashmiri v. Regents of Univ. of Cal.*,
  156 Cal. App. 4th 809 (2007) ...................................................................................... 7

*London Market Insurers v. Super. Ct.*,
  146 Cal. App. 4th 648 (2007) ...................................................................................... 6

*Love v. Fire Ins. Exch.*,
  221 Cal. App. 3d 1136 (1990) ................................................................................... 13

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*,
  210 F. 3d 1099 (9th Cir. 2000) .................................................................................... 6

*Powerine Oil Co. v. Super. Ct*,
  37 Cal. 4th 377 (2005) ......................................................................................... 6, 7, 8

*Saarman Constr., Ltd. v. Ironshore Specialty Ins. Co.*,
   201 F. Supp. 3d 1136 (N.D. Cal. 2016) .................................................................. 8

*Steadfast Ins. Co. v. Dobbas*,
   CIV S-05-0632 FCD JFM, 2008 WL 324023 (E.D. Cal. Feb. 5, 2008) ................... 13

*Waller v. Truck Ins. Exchg.*,
   11 Cal. 4th 1 (1995) .............................................................................................. 7

**Statutes**

Cal. Civ. Code § 1638 ................................................................................................. 7

Cal. Civ. Code § 1641 ................................................................................................. 6

Cal. Civ. Code § 1642 ................................................................................................. 7

Cal. Civ. Code § 1644 ................................................................................................. 7

Cal. Civ. Code § 1647 ................................................................................................. 6

Fed. R. Civ. P. 56(a) .................................................................................................... 6

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.  **INTRODUCTION**

This dispute arises from denial by Aspen Specialty Insurance Company ("Aspen") of coverage under an Environmental Legal Liability Policy that covers "clean-up costs" resulting from a "pollution condition." Essex Walnut Owner, L.P.'s ("Essex") seeks payment of the costs of the redesign of a shoring system that supported the perimeter of an excavation for the foundation of a new, multi-story building. Essex claims a portion of the original shoring system failed because it was anchored with tie backs in rubbish, such as old tires. Essex did not sample the soil that anchored the tie backs and did not excavate any debris from the area in which the tie backs were anchored.[1] Essex incurred costs to replace the affected section of the shoring system. Essex claims the costs to revise its structural shoring system should be paid as "clean-up costs" under the Aspen environmental policy.

The cause of the shoring's failure will remain unknown because the soil in that area was never tested. Even if there was "debris" in that area, as opposed to soil that just could not hold the tie backs, there is no evidence the debris qualifies as a "pollutant" as defined in the Aspen policy.

Furthermore, the costs of structural redesign of the shoring system are not "clean-up costs" or "restoration" as those terms are defined the policy. Essex designed and built a shoring system before it ever discovered any alleged "pollution." Thus, the shoring system was part of the original construction – to support the perimeter of the excavation for construction – and not created because of any "pollution." The need for a shoring system has nothing to do with any polluting quality of the soil and was unrelated to any environmental clean-up.

---

[1] There is no evidence the debris was located in the area or depth at which the tie backs failed. Essex has never provided to Aspen any soil samples showing the presence of or nature of any such debris.

Aspen's Motion for Summary Judgment and Memorandum in Support
CASE NO. 4:17-CV-06435-EMC
1

Aspen denied Essex's claim, and Essex filed for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. Essex cannot prove any of its causes of action. Aspen's environmental insurance policy does not cover construction cost-overruns associated with revisions to a structural shoring system. Therefore, Aspen is entitled to summary judgment in its favor.

## II.     STATEMENT OF ISSUES TO BE DECIDED

This motion presents two issues, and resolution of either of these issues in Aspen's favor disposes of Essex's claims in their entirety:

    (1) Even if Essex could prove there was "debris" that caused the tie backs to fail, is debris consisting of wood, concrete, glass, metal, tires, and tree trunks a "pollutant" as defined in the Aspen policy?

    (2) Is the cost of redesigning a structural shoring system a "clean-up cost" as defined in the Aspen policy?

## III.    UNDISPUTED MATERIAL FACTS

### A.     Essex's Construction Project and Initial Claim

Essex purchased property at 1500 Newell Ave in Walnut Creek, California ("the Site") and demolished existing structures in order to build a new, mixed-use development. (Joint Statement of Undisputed Facts ["Facts"], ¶¶ 3, 5.) In order to support the perimeter of its excavation for the new foundation on the Site, Essex constructed a temporary shoring system. (Facts, ¶ 6.) The shoring system was designed before excavation began and before Essex became aware of any alleged debris. (Facts, ¶¶ 7, 10.)

This shoring system consisted of a wall around the perimeter of the excavation held in place by a series of "tie backs." (Facts, ¶ 8-9 and Exhibit 4.) The tie backs are posts anchored into ground outside the excavated area. (Facts, ¶ 8.) As illustrated in the plans for the shoring system, the tie backs are drilled at a downward angle into soil outside the retaining wall. (Facts, ¶ 8 and Exhibit 3, ESSEX000278-279.) This is an

1  illustration of a simplified diagram, generally illustrating the relative locations of an
2  anchored tie back, the retaining wall, the excavated area, and the ground-level:



13      The tie backs at the Site were not anchored in the excavated area.  (Facts, ¶
14  20.)  The design called for these tie backs to be placed at locations around the
15  perimeter of the excavation, shown numbered in a clock-wise direction on a birds-eye
16  diagram of the Site.  (Facts, ¶ 9 and Exhibit 4.)
17      During its excavation, Essex found a small debris field within the excavated
18  area, consisting of old tires, tree trunks, and other non-hazardous materials.  (Facts, ¶¶
19  11-12.)  The debris is indicated on a diagram of the Site as an irregular area within the
20  excavated area, located approximately between numbers 107 through 118.  (Facts, ¶
21  13 and Exhibit 4.)  Essex also found areas allegedly containing petroleum and lead
22  within the excavated area.  (Facts, ¶ 14.)  Essex notified Aspen of petroleum, lead, and
23  debris found within the excavated area on or before December 13, 2013.  (Facts, ¶ 15.)
24      So as not to delay Essex's construction, Aspen and Essex agreed that Essex
25  could proceed with disposal of any contaminated soil pursuant to regulatory
26  requirements.  (Facts, ¶ 17 and Exhibit 5.)  The parties subsequently settled Essex's
27  claims relating to the excavated area, including removal of debris from within the
28  excavated area.  (Facts, ¶ 23; Declaration of Gregory Kinzel ["Kinzel Dec."], ¶ 5.)  In its

First Amended Complaint, Essex does not contest Aspen's resolution of the part of the claim relating to the excavation. (Cmplt., Dkt. No. 1-1.) In resolving the excavation part of the claim, Aspen did not concede the debris in the excavated area was a "pollutant." (Kinzel Decl., ¶ 5.)

This motion relates to Essex's dispute as to whether there is any coverage under the policy for costs relating to the shoring system (as opposed to in the excavated area).

### B. The Revised Shoring System

After constructing the original shoring system, Essex found that the tie backs in one section, located at numbered beams 106 to 126, were failing. (Facts, ¶¶ 9, 19 and Exhibit 4.) Essex redesigned the shoring system. (Facts, ¶ 6, 22.)

The tie backs were anchored in soil outside the perimeter of the excavated area of the construction project. (Facts, ¶ 20.) Essex did not sample the soil in which the tie backs were anchored, nor did Essex excavate any debris from the area in which the tie backs were anchored. (Facts, ¶ 18, 20-21.)

Essex incurred and now seeks to recover from Aspen costs associated with changing the support structure for its excavation and "delay costs." (Cmplt., ¶ 24.) Essex's claim does not include costs to remove debris from the area in which the shoring system was anchored, as no debris was removed from that area. (Facts, ¶ 18, 20.) The current claim does not seek recover of costs for removing debris within the excavated area, as the parties already compromised that part of the claim. (Facts, ¶ 23; Kinzel Decl., ¶ 5.)

### C. The Aspen Policy

Aspen issued Environmental Legal Liability Policy no. ERACG7R13 to Essex for the policy period September 6, 2013 to September 6, 2018 (the "Policy"). (Facts, ¶ 1 and Exhibit 1.) The insuring agreement provides, "In excess of the applicable Deductible, the **insurer** will pay on behalf of the **insured** … **Clean-up cost** incurred by

the **insured** resulting from a **pollution condition** on, at, under, or migrating from or through an **insured location**." (Facts at Exhibit 1, ASPEN04471.)

"Clean-up cost" is defined as follows:

> **Clean-up cost** means reasonable and necessary expense incurred with the **insurer's** prior written consent, including legal expense and **restoration cost**, to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of contaminated soil, surface water or groundwater or other contamination caused by a **pollution condition** but only: (i) to the extent required by **environmental law,** required to satisfy a **voluntary clean-up program**, or, in the absence of applicable **environmental law**, as determined reasonable and necessary by an **environmental professional**; or (ii) for cost incurred by any governmental entity of the United States of America including its territories and possessions or Canada or by a third-party; provided however reasonable and necessary expense incurred under this item (ii) may be incurred without **the insurer's** prior written consent but only if and to the extent such expense was incurred by such governmental entity without advance noticed to the **insured** or reasonable opportunity for the **insured** to consent to, agree to, comment upon, or object to such expense. (Facts at Exhibit 1, ASPEN04480.)

"Pollution condition" requires the presence of a "pollutant," which is defined as:

> Any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation smoke, vapors, soot, silt, sediment, fumes, acids, alkalis, chemicals hazardous substances, petroleum hydrocarbons, low level radioactive matter or waste, **microbial matter**, legionella pneumophila, medical, infectious or pathological waste or waste materials, methamphetamines, electromagnetic fields, **biological agent** or **nanotechnology matter** (but only to the extent such **nanotechnology matter's** existence, use or process is known by the **insured** and affirmatively disclosed in the application). (Facts at Exhibit 1, ASPEN04482.)

"Restoration cost" is defined in the Policy as:

> Reasonable and necessary expense incurred by the **insured** with the **insurer's** prior written consent to repair or replace damaged real or personal property, when such damage occurs during the course of incurring covered **clean-up cost**, **microbial matter prevention cost**, **emergency response cost** or **crisis cost**, regardless of whether such damage to such real or personal property is caused by a **pollution condition**. **Restoration cost** shall not exceed the replacement cost of such real or personal property. Further, except for **green up-grade cost**, repair or replacement in kind or quality exceeding that of the real or personal property before it was damaged, whether at the **insured's**

option or not, are betterment costs that are not included in **restoration cost** and shall be incurred at the sole expense of the **insured**. (Facts at Exhibit 1, ASPEN04483.)

## IV.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is proper when there is no genuine dispute as to the material facts, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the movant meets its burden on summary judgment, the nonmovant may not resist summary judgment by "[m]ere allegations or denials." *Flintkote v. Gen. Acc. Assur. Co.*, 410 F. Supp. 2d 875, 881 (N.D. Cal. 2006) (citation omitted). The nonmovant must produce admissible evidence that shows a genuine issue of material fact exists. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).

### B.  Interpretation of Insurance Policies

Under California law, although insurance policies have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. *Powerine Oil Co. v. Super. Ct. ("Powerine II")*, 37 Cal. 4th 377, 390 (2005), *modified* Oct. 26, 2005); *London Market Insurers v. Super. Ct.*, 146 Cal. App. 4th 648, 655-56 (2007). The insurance policies must be considered as a whole, with the language they contain interpreted in context, rather than in isolation. Cal. Civ. Code § 1641.

"Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. Such intent is to be inferred, if possible, solely from the written provisions of the contract." *AIU Ins. Co. v. Super. Ct.*, 51 Cal. 3d 807, 821-822 (1990) (citation omitted). Although "a contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates" (Cal. Civ. Code § 1647), such circumstances are not unlimited. For instance, the fact that other policies may or may not offer the same coverage is not a circumstance relevant to the meaning of a particular insurance policy, as insurers are free to choose which risks to insure. *Coregis Ins. Co. v.*

*Camico Mut. Ins. Co.*, 959 F. Supp. 1213, 1219 (C.D. Cal. 1997) (citing California law for the proposition that "an insurer may select the risks it will insure"); *see also* Cal. Civ. Code § 1642 (interpreting several contracts together only when they relate to the same matters, are between the same parties, and were made "as parts of substantially one transaction"). Thus, whether an insurer excludes something from coverage under one policy is irrelevant to whether the risk is covered under another policy, as insurers are not obligated to offer insurance to cover every conceivable risk. Moreover, circumstances surrounding a policy "cannot be considered for the purpose of creating undertakings contrary to the specific terms of the writing." *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 838 (2007).

If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. Cal. Civ. Code § 1638; *GGIS Ins. Servs., Inc. v. Super. Ct.*, 168 Cal. App. 4th 1493, 1506 (2008). Courts interpret the terms of an insurance policy according to the ordinary and popular sense of the words used, unless the words are used in a technical sense or a special meaning is given to them by usage. Cal. Civ. Code § 1644; *Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 59 Cal. 4th 277, 288 (2014).

A policy provision is not ambiguous unless it is capable of two or more reasonable, but conflicting, constructions. *Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 18 Cal. 4th 857, 868 (1998); *Waller v. Truck Ins. Exchg.*, 11 Cal. 4th 1, 18 (1995). A term is not ambiguous just because it is not defined in the policies, because there is disagreement about the meaning of a phrase, or because a word or phrase is susceptible to more than one meaning. *Powerine II*, 37 Cal. 4th at 390-91 (citations omitted). An ambiguity cannot be created where none exists. *Waller*, 11 Cal. 4th at 19; *see also Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1265 (1992) (language in a contract cannot be found ambiguous in the abstract but must be considered in the context of the contract as a whole).

/ / /

C.      **A Duty to Indemnify Requires Actual, Not Merely Potential, Coverage**

To prevail on summary judgment, Essex has the burden of establishing that its claims fall within the scope of the policy's coverage. *Saarman Constr., Ltd. v. Ironshore Specialty Ins. Co.*, 201 F. Supp. 3d 1136, 1155 (N.D. Cal. 2016) ("As the insured, Saarman bears the burden of proving that its claim was *actually* covered under the policy to establish indemnity [emphasis in original].").  Moreover, because Essex seeks indemnity, Essex has the burden of proving actual – and not merely potential – coverage.  *Buss v. Super. Ct.*, 16 Cal. 4th 35, 45 (1997).  "The insurer is entitled to summary adjudication that no potential for indemnity exists … if the evidence establishes as a matter of law that there is no coverage."  *Saarman*, 201 F. Supp. 3d at 1155, citing *Powerine II,* 37 Cal. 4th at 390.

V.      **ARGUMENT**

A.      **There is No Coverage for Essex's Claim**

Aspen is entitled to summary judgment on Essex's causes of action for declaratory relief and breach of contract because Essex cannot prove its shoring system had to be replaced because of the presence of debris that fits the definition of "pollutants" in the Aspen Policy, the costs Essex incurred are not "clean-up costs" as defined by the Policy, and Essex did not purchase coverage for construction delays.

1. **Debris is Not a "Pollutant"**

Essex alleges the tie backs holding up its shoring system failed because of the presence of debris consisting of wood, glass, concrete, metal, tires and tree trunks. (Facts, ¶ 12.)  Essex cannot even prove debris was located in the area in which the tie backs failed or that debris caused the tie backs to fail.  Regardless, in any event, Essex cannot prove any such debris is a "pollutant" as defined in the Policy.

For there to be coverage under the Aspen Policy there must be a "pollution condition," which requires that there must be a "pollutant." (Facts at Exhibit 1, ASPEN04482.)

/ / /

The types of debris Essex identified (wood, glass, concrete, metal, tires and tree trunks) are not among the specifically enumerated pollutants in the Policy's definition of "pollutant." The Policy defines "pollutant" as:

> … smoke, vapors, soot, silt, sediment, fumes, acids, alkalis, chemicals, hazardous substances, petroleum hydrocarbons, low level radioactive matter or waste, microbial matter, legionella pneumophilia, medical, infectious or pathological waste or waste materials, methamphetamines, electromagnetic fields, biological agent or nanotechnology matter. (Facts at Exhibit 1, ASPEN04482.)

The debris Essex describes is also not a liquid, gaseous or thermal irritant or contaminant. (Facts at Exhibit 1, ASPEN04482.)

These items are also not solid irritants or contaminants. (Facts at Exhibit 1, ASPEN04482.) Solid irritants or contaminants are "pollutants" under the Policy only where they are similar in kind to the enumerated list in the Policy's definition of "pollutants." This principle (known as *eujusdem generis*) was recently relied upon by the Ninth Circuit in *Guam Industrial Services, Inc. v. Zurich American Ins. Co.*, 787 F.3d 1001 (9th Cir. 2015). In that case, the court held that sealed barrels of oil that fell into the ocean – but did not spill oil – were not pollutants. The relevant provision in the Zurich policy in that case defined pollutants as "smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative." *Id.* at 1006. The court first held that the barrels "clearly do not qualify as any of the specified substances." *Id.* The court then considered whether the barrels fell within the policy's catch-all category of "other irritants, contaminants or pollutants." *Id.* The court recited the "familiar canon of statutory construction that [catchall] [sic] clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated." *Id.* Because the only enumerated categories in the pollution exclusion were "chemicals and other hazardous substances," the court concluded that the sealed barrels were not irritants, contaminants or pollutants. *Id.* at 1007.

Here, the debris described by Essex is not similar to any of the specifically enumerated pollutants in the definition of "pollutants" in the Policy. Wood, glass,

concrete, metal, tires and tree trunks are unlike acids, hazardous substances, petroleum hydrocarbons, radioactive waste, legionella pneumophilia (which causes Legionnaire's disease), and the like.  Just as the sealed barrels of oil at issue in *Guam Industrial* were dissimilar to the chemicals and hazardous substances in that policy's definition, the debris described by Essex is dissimilar to any enumerated pollutant in the Aspen Policy's definition of "pollutant."

In addition, the Aspen Policy identifies only limited categories of waste that are considered "pollutants."  Only radioactive waste or medical, infectious or pathological waste are "pollutants" under the Policy.  (Facts at Exhibit 1, ASPEN04482.)  The debris at Essex's property has not been proven (nor is it even not alleged) to be radioactive, medical, infectious or pathological waste.  Because the debris Essex identifies is not similar in any of the categories of waste listed in the Aspen Policy, the debris is not a "pollutant" under the Policy.

Even if there was debris and that debris caused the failure of the shoring system (which Essex has not proven), that debris is not a "pollutant" under the Aspen Policy.  Without a "pollutant," there is no "pollution condition."  Aspen is therefore entitled to summary judgment in its favor.

### 2.  Redesign of the Shoring System is Not a "Clean-Up Cost"

Essex alleges that the cost to redesign its shoring system is a "clean-up cost" under the Policy.  (Cmplt., ¶ 24.)  The costs Essex seeks to recover relate to revising its shoring system around the perimeter of the excavation at its building site.  Essex did not incur any "clean-up costs" in connection with this structural work.

The Aspen Policy provides coverage for "clean-up cost," defined (in relevant part) as expense "including legal expense and **restoration cost**, to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of contaminated soil, surface water or groundwater or other contamination caused by a **pollution condition**…" (Facts at Exhibit 1, ASPEN04480.)

/ / /

The simple fact is that Essex's redesign of its shoring was part of its construction of the building at this Site and had absolutely nothing to do with Essex incurring costs to:

- "investigate" or "monitor" any alleged pollutant, as Essex did not sample the area around the failed tie backs (Facts, ¶ 21);
- "remove," "remediate," or "dispose of" any pollutant in the area around the failed tie backs, as Essex did not excavate any from that area (Facts, ¶ 18, 20-21);
- "abate," "treat," or "neutralize" pollutants, as redesign of a temporary support system has no effect on anything in the area of the tie backs that remains unexcavated or treated (Facts, ¶ 18, 20-21); or
- contain any pollutants in the area around the failed tie backs, as the shoring system only bordered Essex's excavation and would not stop pollutants (if they existed in that area) from travelling in any other direction down or away from Essex's excavation (Facts, ¶¶ 8-9 and Exhibits 3-4).

Therefore, Essex's redesign of its shoring system cannot be and was not a "clean-up cost."

In its Complaint, Essex alleges that repair and replacement of the shoring system was a "means to treat, neutralize, and prevent further damage resulting from the debris." (Cmplt., ¶ 17.) The Policy provides that "clean-up costs" consist of expenses "<u>to</u> investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of" contamination. (Facts at Exhibit 1, ASPEN04480.) The use of the word "to" indicates intent: the expenses must be incurred for the purpose taking one of the specified actions with respect to contamination. Here, Essex had already designed and constructed a shoring system before it came to believe (for whatever reason) that there was debris outside the excavated area. (Facts, ¶¶ 6-7, 10, 18.) The shoring system was always intended to support the perimeter of the excavation during construction. (Facts, ¶ 6; *see also* 8 CA ADC § 1540 ["Shoring (shoring system). A

structure such as a metal hydraulic, mechanical or timber shoring system that supports the sides of an excavation and which is designed to prevent cave-ins."].)  Thus, the presence of debris (if there was debris outside the excavated area) neither created nor altered the need for a shoring system.

The same is true of the *redesign* of Essex's shoring system.  That the presence of soil or debris allegedly weakened some of the tie backs does not mean that the shoring system was redesigned in order to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of that soil or debris.  Both the original and redesigned shoring system were built for the purpose of supporting the perimeter of the excavation during construction, as demonstrated by the fact that Essex knew it needed a shoring system – and designed and built one – before Essex ever alleged the presence of debris.  (Facts, ¶¶ 6-7, 10, 18.)

Essex may also claim redesign of the shoring system is a covered "restoration cost."  However, restoration costs are not covered unless incurred in the course of an otherwise covered clean-up.  (Facts at Exhibit 1, ASPEN04483 [definition of "restoration cost"].)  The tie backs were not damaged during the course of incurring a covered clean-up cost.  As discussed above, redesign of the shoring was not a clean-up cost.  Essex cannot identify any clean-up that damaged the tie backs, as Essex did not excavate (or sample) any debris from the area in which the tie backs were anchored.  (Facts, ¶¶ 18, 20-21.)  The mere presence of debris (if Essex were to prove that there even was debris in that area) is not, by itself, a clean-up that could necessitate restoration.  Therefore, any modification to the shoring structure is not a covered "restoration cost" as defined in the Aspen Policy.

Because Essex has not incurred any covered "clean-up cost," Aspen is entitled to summary judgment.

### 3. There is No Coverage for "Delay Costs"

In addition to costs related to revising its shoring system, Essex seeks "delay costs."  (Cmplt., ¶ 24.)  However, Essex did not purchase Business Interruption

Coverage. Item 7 of the Declarations in the Aspen Policy, with respect to business interruption coverage, indicates the applicable limits of liability are "$ NOT PURCH." (Facts at Exhibit 1, ASPEN04465.) The Declarations indicate the coverages purchased by Essex from Aspen. *Steadfast Ins. Co. v. Dobbas*, CIV S-05-0632 FCD JFM, 2008 WL 324023 at *6 (E.D. Cal. Feb. 5, 2008), citing *Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.*, 66 Cal. App. 4th 1080, 1086 (1998) ("The information contained in the Declarations page of a policy will control the coverage provided.").

Aspen is entitled to summary judgment as to Essex's claim for delay costs.

### B. Aspen Did Not Breach the Covenant of Good Faith and Fair Dealing

In Essex's Third Cause of Action, Essex seeks damages for breach of the covenant of good faith and fair dealing. To establish breach of the implied covenant of good faith and fair dealing, Essex must show Aspen breached its contract. Essex is required to prove: (1) benefits due under the Aspen policies were withheld; and (2) such withholding was unreasonable. *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990). Because there is no coverage for Essex's claim for the reasons set forth above, Essex cannot show that benefits are due under the Aspen Policy. Therefore, there was no breach of contract, and it follows, as a matter of law, Essex cannot show Aspen breached the implied covenant of good faith and fair dealing. Therefore, Aspen is entitled to summary judgment on the Third Cause of Action.

## VI. CONCLUSION

Essex cannot prove that "debris" was in the area in which it placed tie backs anchoring the shoring system, or that the presence of debris caused its shoring system to fail in a few places. Regardless, Essex's structural modification of a shoring system that it constructed to brace the walls of an excavated area during construction is not covered under the Aspen Policy for several reasons. First, Essex cannot prove any such debris is a "pollutant" as defined in the Aspen Policy. Without a "pollutant," there is no "pollution condition" as required by the Policy for coverage. Furthermore, the costs for the revised structural work is not an environmental "clean-up cost," as defined

by the Aspen Policy, and Essex did not purchase coverage for what it seeks in delay costs.

Because there is no coverage for Essex's claim, Aspen cannot have breached the contract and therefore cannot have breached the covenant of good faith and fair dealing. For these reasons, Aspen is entitled to summary judgment in its favor on all of Essex's causes of action.

Dated: June 22, 2018

NICOLAIDES FINK THORPE
MICHAELIDES SULLIVAN LLP


By:  _____/s/ Tracy S. Ickes_____
Sara M. Thorpe
Tracy S. Ickes
Attorneys for Defendant Aspen Specialty Insurance Company