1  MICHAEL JOHN MIGUEL (SBN 145182)
   mmiguel@mckoolsmithhennigan.com
2  BRETT D. BISSETT (SBN 280366)
   bbissett@mckoolsmithhennigan.com
3  MCKOOL SMITH HENNIGAN P.C.
   300 South Grand Ave., Ste. 2900
4  Los Angeles, CA 90071
   Telephone:   (213) 694-1200
5  Facsimile:    (213) 694 1234
6
   Attorneys for Plaintiff
7  ESSEX WALNUT OWNER LP.
8  SARA M. THORPE (SBN: 146529)
   sthorpe@nicolaidesllp.com
9  TRACY S. ICKES (SBN: 317380)
   tickes@nicolaidesllp.com
10 NICOLAIDES FINK THORPE
   MICHAELIDES SULLIVAN LLP
11 101 Montgomery Street, Suite 2300
   San Francisco, CA 94104
12 Telephone:   (415) 745-3770
   Facsimile:    (415) 745-3771
13
14 Attorneys for Defendant
   ASPEN SPECIALTY INSURANCE COMPANY

15

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| ESSEX WALNUT OWNER L.P., | Case No. 3:17-cv-06435-EMC |
| Plaintiff, | **JOINT STATEMENT OF UNDISPUTED FACTS** |
| v. | |
| ASPEN SPECIALTY INSURANCE COMPANY, | **Accompanying Documents:** Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities; Declaration of Gregory Kinzel; Proposed Order |
| Defendant. | |
| | Date:            July 27, 2018 |
| | Time:           1:30 p.m. |
| | Judge:          Hon. Edward M. Chen |
| | |
| | Complaint filed:  October 4, 2017 |
| | FAC filed:          October 5, 2017 |
| | Trial Date:         None Set |

## JOINT STATEMENT OF UNDISPUTED FACTS

Plaintiff Essex Walnut Owner L.P. ("Essex") and Defendant Aspen Specialty Insurance Company ("Aspen"), by and through their respective counsel, hereby agree and stipulate to the following facts.

1.      Aspen issued Environmental Legal Liability Policy No. ERACG7E13 to Essex, a true and correct copy of which is Exhibit 1 ("Aspen Policy").

2.      Essex is an "insured" under the Aspen Policy.

3.      Essex purchased three parcels located at 1500 Newell Avenue, Walnut Creek, California ("Site"). A true and correct aerial photograph of the Site prior to construction is attached as Exhibit 2.

4.      The Site is an "insured location" under the Aspen Policy.

5.      In 2013, Essex demolished the existing structures at the Site and began excavation for the new, mixed-use development.

6.      Essex designed an original shoring system as part of the planned construction and mixed-use development at the Site.

7.      The original shoring system was designed by SPI Consulting Engineers, Inc. ("SPI") before excavation began.

8.      The original shoring system consisted of retaining walls anchored by "tie backs" drilled at a downward angle into soil outside the retaining walls. Plans for Essex's original shoring system as of June 2013 are attached as Exhibit 3.

9.      Attached as Exhibit 4 is a true and correct copy of a November 22, 2013 Environmental Survey diagram of the Site. The excavated area is depicted on Exhibit 4 as the area within and surrounded by the numbered beams ("Excavated Area").

10.     At the time the original shoring system was designed, Essex was not aware of any debris within or outside the Excavated Area.

11.     During its excavation, Essex discovered debris buried within the Excavated Area.

12.     The debris consisted of wood, concrete, glass, metal, tires, and large, buried tree trunks.

13.     Exhibit 4 shows the general location of the debris removed from the Excavated Area by the yellow outline.

14.     Essex also discovered petroleum and lead within the Excavated Area.

15.     As of December 13, 2013, Essex made claims under the Aspen Policy related to the discovered debris, petroleum, and lead in the Excavated Area.

16.     Essex gave notice of its claims for coverage during the "policy period" of the Aspen Policy.

17.     Aspen and Essex entered an interim arrangement dated December 13, 2013 and attached as Exhibit 5 regarding the appropriate disposal of the contaminated soil.

18.     At commencement of the construction of the original shoring system and through December 13, 2013, Essex was not aware of any debris outside the Excavated Area.  Essex has never previously and does not presently request that Aspen cover costs to remove any debris outside the perimeter of the Excavated Area.

19.     Essex alleges that failure that occurred from tie backs tested from beams 106 to 126 were due to the presence of debris.

20.     The soil and any debris into which failing tie backs were anchored were not in the Excavated Area.

21.     Soil samples were not collected or tested from the area outside the Excavated Area in which the failing tie backs were anchored.

22.     SPI redesigned the shoring system in the area where the tie backs failed. The redesigned shoring system enabled the planned construction and development at the Site to continue and secured materials outside the Excavated Area.

23.     Essex's claim for certain costs to remove debris from within the Excavated Area was compromised by the parties and is not now part of the current claim.  Essex

1  reserved rights to seek insurance coverage for its other claims not part of the

2  compromise.

3      24.    Exhibits 1-5 attached hereto are authentic and admissible as evidence in

4  this litigation.

5

6

7  Dated: June____, 2018                      MCKOOL SMITH HENNIGAN, P.C.

8                                             By:_____

9                                                  Brett D. Bissett
                                                   Michael John Miguel
10                                            Attorneys for Plaintiff Essex Walnut Owner,
                                             L.P.
11

12 Dated: June _22_, 2018                     NICOLAIDES FINK THORPE
                                             MICHAELIDES SULLIVAN LLP
13

14                                            By:_____

15                                                 Sara M. Thorpe
                                                   Tracy S. Ickes
16                                            Attorneys for Defendant Aspen Specialty
                                             Insurance Company
17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 1**

**ASPEN SPECIALTY INSURANCE COMPANY**
**POLICY NUMBER:** ERACG7E13
**RENEWAL OF:** NEW BUSINESS



# ENVIRONMENTAL LEGAL LIABILITY POLICY DECLARATIONS

Aspen Specialty Insurance Company
c/o Aspen Specialty Insurance Management, Inc.
135 Main Street, Suite 1950
San Francisco, CA 94105

A stock insurance company, incorporated under the laws of
North Dakota, herein called the Company.

**ITEM 1** **FIRST NAMED INSURED** - NAME AND MAILING ADDRESS:

ESSEX WALNUT OWNER, L.P.

925 EAST MEADOW DRIVE
PALO ALTO, CA 94303

**ITEM 2** **POLICY NUMBER:** ERACG7E13

**ITEM 3** **POLICY PERIOD:**
Policy Period:
(a) Inception Date: 09/06/2013
(b) Expiration Date: 09/06/2018

As respects the dates shown above in this Item 3., as of 12:01 a.m. on such date in the time zone applicable
to the address set forth in Item 8.a. of these Declarations.

**ITEM 4** **PREMIUM:**
(a) Policy Premium: $ 52,685
(b) Premium for Certified Acts of Terrorism Coverage: $ 1,581
(c) Total Premium: $ 54,266

**ITEM 5** **FORMS & ENDORSEMENTS ATTACHED TO THIS POLICY AT INCEPTION:**

SEE SCHEDULE OF FORMS AND ENDORSEMENTS

**ITEM 6** **AGGREGATE LIMIT OF LIABILITY:** $ 5,000,000

**ASPER109 DEC 0112**

© Aspen Specialty Insurance Company, 2011
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

**Page 1 of 3**

ASPEN04464

**ITEM 7     PURCHASED COVERAGE SECTIONS - DEDUCTIBLES & LIMITS OF LIABILITY:**

Coverage is applicable only under purchased Coverage Part(s) selected below by us marking the "Yes" box. If the "Yes" box is not marked for a Coverage Part, that Coverage Part has not been purchased. Deductibles and Limits of Liability are completed in this Item 7. only for such purchased Coverage Part(s).

| Purchased Insuring Agreement A Coverage Section | | Pollution Incident Deductible | Pollution Incident Limit of Liability | Coverage Section Limit of Liability |
|---|---|---|---|---|
| 1.a. Clean-up | Yes ☒ | $50,000 | $5,000,000 | $5,000,000 |
| 1.b. Emergency Response | Yes ☒ | $50,000 | $5,000,000 | $5,000,000 |
| 1.c. Environmental Crisis | Yes ☒ | $50,000 | $250,000 | $250,000 |
| 1.d. Business Interruption | Yes ☐ | All amounts incurred during the first XXX days of the business interruption, including the first day thereof. | $NOT PURCH | $NOT PURCH |
| 2.a. Insured Location | Yes ☒ | $50,000 | $5,000,000 | $5,000,000 |
| 2.b. Non-Owned Site | Yes ☒ | $10,000 | $5,000,000 | $5,000,000 |
| 2.c. Transportation | Yes ☒ | $10,000 | $5,000,000 | $5,000,000 |
| 2.d. Covered Operations | Yes ☐ | $NOT PURCH | $NOT PURCH | $NOT PURCH |

**ITEM 8     NOTICES:**

(a) Notices to first named insured:

ESSEX WALNUT OWNER, L.P.

925 EAST MEADOW DRIVE
PALO ALTO, CA 94303

(b) Notices to insurer of claims or pollution conditions or imminent threat thereof:

Aspen Specialty Insurance Company
c/o Aspen Specialty Insurance Management, Inc.
135 Main Street, Suite 1950
San Francisco, CA 94105

Main Tel: 646-502-1000
Fax: 646-502-1020
Email: environmental.claims@aspen-insurance.com

(c) all other notices to the insurer:

Aspen Specialty Insurance Company
Attn: General Counsel
175 Capital Boulevard, Suite 100
Rocky Hill, CT 06067
Tel: 860-760-7758

**ASPER109 DEC 0112**       © Aspen Specialty Insurance Company, 2011
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.       **Page 2 of 3**

ASPEN04465

**ITEM 9**     **BROKER:**

AON RISK INSURANCE SERVICES WEST, INC.
225 WEST SANTA CLARA STREET, SUITE 1150
SAN JOSE, CA 95113

License No.:  0363334

This Declarations page, together with the attached Policy form, any Applications, Schedules, and Endorsements thereto, shall constitute the contract between the Insurer and the Insured.

In whitness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Insurer.

Issued on:    10/07/213

*Jaime E. De Cantillon*
**Authorized Representative**

© Aspen Specialty Insurance Company, 2011
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

ASPEN04466



**ASPEN SPECIALTY INSURANCE COMPANY**

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Secretary and countersigned where required by law on the Declarations page by its duly Authorized Representative.

_____
Secretary

_____
President

**ASPCO098 0213** **Page 1 of 1**

ASPEN04467

# CALIFORNIA NOTICE

1. **THE INSURANCE POLICY THAT YOU (HAVE PURCHASED) (ARE APPLYING TO PURCHASE) IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

2. **THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT WHICH APPLIES TO CALIFORNIA LICENSED INSURERS.**

3. **THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

4. **THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.**

5. **FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

SN-CA 0612             Page 1 of 2

ASPEN04468

6. **FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

7. **CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THATLIST, OR VIEW THAT LIST AT THE WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE:**

   **WWW.INSURANCE.CA.GOV**

8. **IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**

**SN-CA 0612**                                                           **Page 2 of 2**

ASPEN04469

# SCHEDULE OF APPLICABLE FORMS

**NAMED INSURED:** ESSEX WALNUT OWNER, L.P.

**POLICY NUMBER:** ERACG7E13
**EFFECTIVE DATE:** 09/06/2013

**FORMS AND ENDORSEMENTS MADE PART OF THIS POLICY AT TIME OF ISSUE:**
**FORM NUMBER AND TITLE:**

| Form Number | Title |
|---|---|
| ASPER109 DEC 0112 | Environmental Legal Liability Policy Declarations |
| ASPCO098 0213 | Signature Page |
| SN-CA 0612 | California Notice |
| ASPER027 0709 | Schedule of Applicable Forms |
| ASPER110 0212 | Environmental Legal Liability Policy |
| ASPER098 1211 | Cap On Losses From Certified Acts Of Terrorism |
| IL 09 85 01 08 | Disclosure Persuant to Terrorism Risk Insurance Act |
| ASPER117 0112 | Manuscript Endorsement |
| ASPER117 0112\2 | Manuscript Endorsement |
| ASPER117 0112\3 | Manuscript Endorsement |
| ASPER149 0612 | Aggregate Deductible & Each Incident Maintenance Deductible |
| ASPER154 1012 | Disclosed Documents Endorsement |
| ASPER162 0612 | Material Change in Use Exclusion |
| ASPER164 1012 | Minimum Earned Premium Endorsement |
| ASPER170 1012 | Schedule of Insured Locations |

**ASPER027 0709**      Includes copyrighted material of ISO, Inc., with its permission.      **Page 1 of 1**

ASPEN04470



# ENVIRONMENTAL LEGAL LIABILITY POLICY

**NOTICE:** This is a Claims Made and Reported Policy and contains provisions which restrict coverage and are unique. The insured must read the entire Policy carefully to determine rights, duties and what is and is not covered hereunder. Bold words and phrases, other than headings, are defined terms as set forth in Clause IX. of this Policy, and other terms are defined elsewhere in this Policy. Bold headings appear solely for convenience and are not part of the terms or conditions of this Policy**.**

In consideration of payment of premium when due and in reliance upon the **application**, only those purchased Coverage Sections as set forth in Item 7. of the Declarations are applicable and the **insurer** shall apply such coverage as follows:

CLAUSE I.     **INSURING AGREEMENTS**

It is a condition precedent to coverage under this Policy, hereby included under each Insuring Agreement and Coverage Section, that during the **policy period**: (i) any **pollution condition** or **imminent** threat thereof must be first discovered by a **responsible insured** and first reported to the **insurer**; (ii) solely as respects any coverage for a **claim**, the **claim** must be first made against the **insured** and first reported to the **insurer**; (iii) the **pollution condition** or **imminent** threat thereof and any **claim** must be reported to the **insurer** in accordance with Clause III. of this Policy; and (iv) the **insurer** is obligated to pay **loss** resulting from any **claim** only to the extent that the **insured** is legally obligated to pay such **claim**.

INSURING AGREEMENT A.     **COVERAGE SECTIONS**

In excess of the applicable Deductible, the **insurer** will pay on behalf of the **insured:**

1.     **First Party Protection**

    **a.   Clean-up**
**Clean-up cost** incurred by the **insured** resulting from a **pollution condition** on, at, under, or migrating from or through an **insured location**.

    **b.  Emergency Response**
**Emergency response cost** incurred by the **insured** resulting from a **pollution condition** or **imminent** threat thereof.

    **c.  Environmental Crisis**
**Crisis cost** incurred by the **insured** resulting from a **pollution condition** or **imminent** threat thereof.  **Crisis cost** is not **loss** and shall not erode the **aggregate limit of liability**.

    **d.  Business Interruption**
**Business interruption cost** incurred by the **insured** and caused directly by a **pollution condition**, on, at or under an **insured location** resulting in **clean-up cost**.

2.  **Third-Party Claims**

    **a.   Insured Location**
**Loss** incurred by the **insured** as a result of **claims** for **bodily injury**, **property damage** or **environmental damage** resulting from a **pollution condition** on, at, under, or migrating from or through an **insured location**.

    **b.   Non-Owned Site**
**Loss** incurred by the **insured** as a result of **claims** for **bodily injury**, **property damage** or **environmental damage** resulting from a **pollution condition** on, at, under, or migrating from or through any **non-owned site**.

    **c.   Transportation**
**Loss** incurred by the **insured** as a result of **claims** for **bodily injury**, **property damage** or **environmental damage**

Copyright, Aspen Specialty, 2011
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

ASPEN04471

resulting from a **pollution condition** caused by **transportation**.

d.  **Covered Operations**
**Loss** incurred by the **insured** as a result of **claims** for **bodily injury**, **property damage** or **environmental damage** resulting from a **pollution condition** caused by **covered operations**.

INSURING AGREEMENT B.    **AUTOMATIC COVERAGE EXTENSIONS**

Subject to any and all limits, conditions, exclusions, and terms of coverage applicable under the operative purchased Coverage Section in Insuring Agreement A. and in excess of any remaining Deductible applicable thereunder, the **insurer** agrees to extend coverage as follows:

1.  **Additional Insured**
**Loss** incurred by an **additional insured** but solely as respects any litigation: (i) arising from a **pollution condition** otherwise subject to coverage under Insuring Agreement A.; and (ii) continually maintained against such **additional insured** as a co-defendant of any **insured**.

2.  **Executive Indemnity**
**Loss** incurred directly by any **executive officer** and resulting from a **pollution condition** or **imminent** threat thereof otherwise subject to coverage under Insuring Agreement A., provided no other **insured** is required or permitted to indemnify such person for such **loss** and no other insurance is applicable to such **loss**.  In the event other insurance or indemnity is applicable to such **loss**, then this insurance shall apply as excess insurance as provided in Clause VI. of this Policy.

3.  **Green Up-Grade**
**Green up-grade cost** accompanying any **restoration cost** covered under Insuring Agreement A.

4.  **Insured Contracts**
**Loss** incurred by the **insured** resulting from an obligation: (i) for a **pollution condition** otherwise subject to coverage under Insuring Agreement A.; and (ii) undertaken by such **insured** pursuant to an **insured contract**.

5.  **Insured Location Devaluation**
**Property devaluation** incurred by the **insured** resulting directly from a **pollution condition** at, on or under an **insured location** resulting in **clean-up cost** covered under Insuring Agreement A.

6.  **Microbial Matter Prevention**
**Microbial matter prevention cost** incurred by the **insured** to prevent **microbial matter** that would be subject to coverage under Insuring Agreement A., provided no other insurance is applicable to such **loss**.  If other insurance is applicable to such **loss**, then this insurance shall apply as excess insurance as provided in Clause VI. of this Policy.

7.  **Parental Indemnity**
**Loss** incurred directly by any entity that owns or controls more than 50% of the **first named insured** resulting from a **pollution condition** or **imminent** threat thereof otherwise subject to coverage under Insuring Agreement A., provided no other insurance is applicable to such **loss**.  If other insurance is applicable to such **loss**, then this insurance shall apply as excess insurance as provided in Clause VI. of this Policy.

8.  **Supplemental Legal Expense**
**Supplementary payment** incurred by the **insured** resulting from a **pollution condition** covered under this Policy. **Supplementary payment** is not **loss** and shall not erode the **aggregate limit of liability**.

Provided all amounts under Insuring Agreement B. shall be paid by the **insurer** on behalf of the **insured** under the above Automatic Coverage Extensions and all such amounts (except for **supplementary payments**) erode, are included in, and are not in addition to, the operative Coverage Section Limit of Liability in Insuring Agreement A. and nothing in this Insuring Agreement B. shall increase any Limit of Liability.

INSURING AGREEMENT C.    **DEFENSE AND SETTLEMENT**

Subject to any and all limits, conditions, exclusions, and terms of coverage applicable under the operative purchased Coverage Section in Insuring Agreement A. and in excess of any remaining applicable Deductible thereunder, the **insurer** agrees to provide defense as follows:

**ASPER110 0212**                    Copyright, Aspen Specialty, 2011                    **Page 2 of 13**
                        Includes copyrighted material of Insurance Services Office, Inc.,
                                with its permission.

ASPEN04472

1. **Defense**

   a. The **insurer** has the right and duty to defend any **claim** subject to coverage, even if false, fraudulent or groundless. Accordingly, the **insurer** shall pay all reasonable and necessary legal expenses in defense of any such **claim**. The **insurer** shall have no duty to assume defense of, or to continue to defend, any **claim** once the applicable Limit of Liability is exhausted, and all duties to provide any defense under this Policy shall cease once the **aggregate limit of liability** is exhausted. All covered legal expenses, solely except for a **supplementary payment**, are included in **loss** and erode the applicable Limit of Liability.

   b. Where the **insured** is legally entitled to select independent counsel in defense of such a **claim**, reasonable and necessary legal expenses shall be paid by the **insurer** as provided in subparagraph a. above in this Insuring Agreement C.; provided reasonable and necessary legal expenses for such independent counsel shall mean only those incurred: (i) for counsel qualified and experienced in defending **claims** similar to the subject pending **claim**; and (ii) at the rate which the **insurer** would actually pay for the defense of a similar **claim** in the subject community. Accordingly, any legal expense incurred for such independent counsel that does not meet the conditions precedent to coverage in (i) and (ii) above shall be at the sole expense of the **insured**.

   c. Where the **insured** is not legally entitled to independent counsel, the **insurer** has the right to appoint one counsel to defend all **insureds** in any **claim** to the extent permitted under applicable ethical requirements**.**

2. **Settlement**

   a. The **insured** has the right to consent to any monetary settlement recommendation made by the **insurer** for any **claim**. In the event of any such **insured's** refusal to consent, the **insurer's** duty to adjust, negotiate or defend such **claim** shall cease and the **insurer's** liability for that **claim** shall not exceed the amount of the **insurer's** settlement recommendation plus those reasonable and necessary legal expenses (incurred in accordance with Paragraph 1. of this Insuring Agreement) incurred up to the date of the subject settlement recommendation.

   b. In the event the **insured** and the **insurer** resolve any **claim** as a direct result of mediation (meaning an alternative non-binding dispute resolution process facilitated by a neutral third-party), the **insurer** shall reimburse, as soon as practicable to the **first named insured**, 50% of any applicable Deductible paid by such **insured**, up to a maximum of $50,000 per **claim**.

CLAUSE II.   **EXCLUSIONS**

This Policy does not apply to any **claim**, **possible claim**, **loss**, **crisis cost,** legal expense, or **supplementary payment** (or any other factor or matter asserted as giving rise to coverage under this Policy) arising from or related to:

**Asbestos and Lead**
Asbestos, asbestos-containing materials or lead-based paint installed, applied or contained in, on, or to any building or structure, including any removal of such materials there from and disposal thereof, even where such removal or disposal is intended to leave the asbestos, asbestos-containing materials or lead-based paint in-tact. This Exclusion does not apply to: (i) **claims** for **bodily injury** or **property damage**; or (ii) **clean-up cost** that, in either case, arises out of the inadvertent disturbance of asbestos or asbestos containing materials or lead-based paint or that is incurred for the remediation of soil, surface water or groundwater.

**Contractual Liability**
Any obligation assumed by any **insured** in any contract or agreement. This Exclusion does not apply to an obligation an **insured** would have in the absence of a contract or agreement, or an obligation assumed by an **insured** in an **insured contract**. Provided however, no **loss** that occurs prior to the execution of any contract or agreement, regardless of whether such contract is an **insured contract**, shall be afforded any coverage under this Policy.

**Criminal Fines, Penalties and Assessments**
Any criminal fines, criminal penalties or criminal assessments.

**Damage to Conveyance**
**Property damage** to any conveyance utilized by or on behalf of any **insured** during **transportation**. This Exclusion is not applicable to **claims** for such **property damage** arising from such **insured's** negligence.

ASPEN04473

**Damage to Insured's Work**
**Property damage** to work performed by or on behalf of any **insured** caused by **covered operations**.

**Divested Properties**
Any property which the **insured**: (i) sold, terminated leasing, leased, gave away or relinquished operational or management control of prior to the **inception date**; or (ii) abandoned at any time.

**Employment Liability**
Any injury sustained by any person arising from their employment with the **insured** or any other liability of any **insured** arising from or related to workers' compensation, employment liability, disability benefits, unemployment compensation or any similar obligation under any employment-related law. This Exclusion extends to any: (i) **claim** arising from blood, marital or other relation to any past or present employee of any **insured** and notwithstanding whether the subject **insured** may be liable as an employer or in any other capacity; and (ii) obligation to share damages with or repay someone else who must pay any damages for any such employment-related injury, liability or matter. This Exclusion does not apply to the **insured's** liability for **bodily injury** assumed under an **insured contract**.

**Identified Underground Storage Tanks**
Any **underground storage tank** located on an **insured location**, the existence of which is known by any **responsible insured** as of the **inception date** or which is identified in the **approved acquisition standard**, unless such **underground storage tank** is scheduled on the Underground Storage Tank Endorsement, if any, as attached to and made part of this Policy. This Exclusion does not apply to any **underground storage tank** which has been closed, abandoned in place or removed prior to the **inception date** in accordance with **environmental law**.

**Insured's Products**
Any goods or products (including containers thereof) manufactured, sold, handled, distributed, altered or repaired by any **insured** or others trading or operating under any **insured's** name. This Exclusion extends to any obligation or liability arising from or related to warranties and representations respecting the fitness of such goods or products and to the failure to provide warnings or instructions for such goods or products. This Exclusion does not apply solely as respects **loss** arising from **transportation** or storage at a **non-owned site**.

**Insured versus Insured**
Any **claim** or legal proceeding brought by or on behalf of any **insured** against any other **insured** under this Policy. This Exclusion does not apply to a **claim** initiated by a third-party or that arises out of an indemnification given by one **insured** to another **insured** in an **insured contract**.

**Intentional Non-Compliance**
Any **responsible insured's** intentional, willful or deliberate noncompliance with any **environmental law**. This Exclusion does not apply to the **insured's** action taken in good faith in: (i) reliance upon written advice of qualified outside counsel received in advance of such **loss** or non-compliance; or (ii) mitigation of an **environmental crisis** or **emergency response cost**.

**Internal Expenses**
Any costs, charges or expenses, incurred by any **insured** for goods supplied or services performed by the staff or salaried employees of any **insured**, unless such costs, charges or expenses are incurred with the prior written approval of the **insurer**, which approval may be given or denied in the sole discretion of the **insurer**. This Exclusion does not apply to a **supplementary payment**.

**Prior Knowledge and Non-Disclosure**
Any **pollution condition** or **claim** known by any **responsible insured** prior to the **inception date** but not disclosed in the **application**. This Exclusion extends to any continuation, change, reopener or resumption of such undisclosed **pollution condition**.

**Punitive Damages**
Any punitive, exemplary or the multiplied portion of multiple damages, or any civil or administrative fines, penalties or assessments, except where such damages, fines, penalties or assessments are insurable by applicable law.

**War**
**Loss** arising out of or in connection with war, invasion, act of foreign enemy, hostilities, whether war be declared or not, or civil war, insurrection, rebellion, revolution, usurped power, strike, riot or civil commotion.

---

**ASPER110 0212**                Copyright, Aspen Specialty, 2011              **Page 4 of 13**
                        Includes copyrighted material of Insurance Services Office, Inc.,
                                    with its permission.

ASPEN04474

CLAUSE III.  **RIGHTS AND DUTIES IN THE EVENT OF A POLLUTION CONDITION, CLAIM OR POSSIBLE CLAIM**

A.  **INSURED**

1.  During the **policy period** and as soon as practicable upon the **responsible insured's** first notice of any **claim** or first discovery of any **pollution condition** or **imminent** threat thereof, any of which may result in the **insurer's** obligation to provide any coverage or make any payments under any provision of this Policy, and no later than the 15th day following the commencement of a **pollution condition** or **imminent** threat thereof resulting in **emergency response cost** or **crisis cost**, such **insured** shall have the duty to:

   a.    provide written notice to the **insurer** in accordance with the Notice Condition set forth in Clause VIII. of this Policy and include any information reasonably available to such **insured** concerning any **claim**, **pollution condition** or **imminent** threat thereof, injury or damage resulting there from. Such information shall include, but is not limited to, how, when and where any **claim**, **pollution condition** or **imminent** threat thereof took place, the names and addresses of any injured persons or witnesses, technical reports, laboratory data, field notes, expert reports, investigations, data collected, invoices, regulatory correspondence or any other pertinent documents including, in the event of any **claim**, all demands, summons, notices or other process or papers filed in any court, or with or received from any governmental agency or body;

   b.    mitigate and clean-up any **pollution condition** or **imminent** threat thereof to the extent required by **environmental law** by retaining an **environmental professional**;

   c.    provide to the **insurer** proposed work plans, bids, contracts, agreements or any similar document, concerning work to result in **clean-up cost** (except for **emergency response cost** or **crisis cost**), which proposals shall be subject to the **insurer's** right to prior consent; and

   d.    provide to the **insurer** at reasonable intervals (and always at least 30 days prior to submittal of any progress report to any regulatory agency) written progress reports concerning the work resulting in **clean-up cost**.

2.  In the event that the **insured** makes any report of a **pollution condition** thereof that results in only a **possible claim** during this **policy period**, then any **claim** arising from such **pollution condition** within 6 years after the **expiration date** or any continuous uninterrupted renewal of this **policy period** shall be deemed first made and reported during this **policy period** and subject to the coverage, terms, conditions and applicable Limits of Liability of this Policy; provided no **imminent** threat of a **pollution condition** that did not result in **loss** incurred during this **policy period** shall constitute a **possible claim** under this Policy.

B.  **INSURER**

The **insurer** shall have the right but not the duty to mitigate and clean-up (including assuming direct control of any mitigation or clean-up) any **pollution condition** or **imminent** threat thereof which may result in the **insurer's** obligation to provide any coverage or make any payments under any provision of this Policy. In the event that the **insurer** asserts any portion of such right to mitigate or clean-up, then any amounts spent by the **insurer** to mitigate or clean-up shall erode the applicable Limits of Liability and the **insured** will reimburse the **insurer** as soon as practicable for any portion of any applicable Deductible advanced while taking such action.

C. **MULTIPLE POLICIES, CLAIMS OR POLICY PERIODS**

1.  Any **claim** for **bodily injury**, **property damage**, or **environmental damage** or any **pollution condition**  or **imminent** threat thereof will be deemed known by the **insured** at the earliest time of when any other **insurer**, any **insured** or **responsible insured**: (i) receives or gives notice of the subject **bodily injury**, **property damage**, or **environmental damage** or any **pollution condition** or **imminent** threat thereof; (ii) receives a written or verbal demand or **claim** covered or potentially subject to coverage under this Policy; or (iii) becomes aware by any other means that any factor or matter that may be asserted as giving rise to coverage under this Policy has occurred or has begun to occur.

2.  Subject to subparagraph 1. above, if the **insured** first discovers and reports a **pollution condition** or **imminent** threat thereof to the **insurer** during this **policy period**, any **pollution incident** or **claim** or **loss** arising from or related to such **pollution condition** or **imminent** threat thereof, reported to the **insurer** during subsequent policies issued by the **insurer** to the **insured** providing substantially the same coverage, will be deemed to have been first discovered or made during this **policy period**.  To the extent there is coverage under this Policy for such **pollution condition** or **claim** or **loss**, such **pollution condition**, **claim** and **loss** shall be deemed one **pollution incident** subject to all of the terms, conditions, limitations and exclusions as provided under this Policy, including without limitation the Pollution Incident Limit of Liability

Copyright, Aspen Specialty, 2011
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

ASPEN04475

of this Policy.

3. Coverage under this Policy shall not apply to such **pollution incident** or **claims** or **loss** identified in subparagraph 2. unless the **insured** has maintained with the **insurer** an insurance policy providing substantially the same coverage as provided in this Policy on a continuous and uninterrupted basis since the first **pollution condition** or **imminent** threat thereof giving rise to **claim** or **loss** was discovered by the **insured** or any **claim** or **loss** arising therefrom was first reported to the **insurer**.

## CLAUSE IV.   **EXTENDED REPORTING PERIOD**

If the: (i) **policy period** was not terminated due to non-payment of premium, or fraud or misrepresentation; (ii) **first named insured** has not purchased any other insurance to replace this insurance; and (iii) **claim** arises from a **pollution condition** that first commenced before the **expiration date** and is otherwise subject to coverage under this Policy, then such **claim** shall be deemed first made and reported on the last day of the **policy period** provided such **claim** is otherwise made in accordance with Clause III. of this Policy and pursuant to Paragraph A. or B. below in this Clause as applicable:

### A.   **AUTOMATIC EXTENDED REPORTING PERIOD**
The **insured** has the automatic right to report any **claim** within the first 90 days following the **expiration date**; provided no part of this Paragraph A. shall apply if the Optional Extended Reporting Period is purchased pursuant to Paragraph B. of this Clause IV.

### B.   **OPTIONAL EXTENDED REPORTING PERIOD**
The **first named insured** is entitled to purchase an Optional Extended Reporting Period upon providing notice to the **insurer** within the first 30 days following the termination of the **policy period** of its election to purchase the Optional Extended Reporting Period Endorsement, which Endorsement shall be effective for up to 48 months at a rate of not more than 200% of the premium set forth in Item 4.(c.) of the Declarations. Such Optional Extended Reporting Period shall become effective only if and when the **insured** pays the additional premium when due as indicated by the **insurer** and the **insurer** issues such Endorsement. Such additional premium shall be fully earned upon payment.

## CLAUSE V.   **LIMITS OF LIABILITY AND DEDUCTIBLES**

In this Clause V. and throughout this Policy, each reference to Deductible or Limit(s) of Liability means those applicable amounts as provided in Item 7. of the Declarations. The applicable Limits of Liability apply in excess of the applicable Deductible amounts.  The **insurer** has no duty to make any payment under this Policy until the applicable Deductible is paid by the **first named insured**.

### A.   **POLICY LIMIT**
No matter the number of **additional insureds**, **insureds**, **claims**, claimants, **possible claims**, or **pollution incidents**, or any other factor or matter asserted as giving rise to coverage under this Policy: (i) the applicable Limit of Liability applies in excess of the applicable Pollution Incident Deductible; (ii) the most the **insurer** shall pay for all **loss** under this Policy is the **aggregate limit of liability** set forth in item 6. of the Declarations; and (iii) all duties to make any payment under this Policy shall cease once such **aggregate limit of liability** is exhausted.

### B.   **COVERAGE SECTION LIMIT AND DEDUCTIBLE**
Subject to Paragraph A. of this Clause, the most the **insurer** is obligated to pay for each Coverage Section under all Insuring Agreements is the operative Coverage Section Limit of Liability.  If any event or factor gives rise to coverage under multiple Coverage Sections, only the highest applicable Pollution Incident Deductible shall apply; and the most the **insurer** shall pay is the highest applicable Coverage Section Limit of Liability.

### C.   **POLLUTION INCIDENT LIMIT AND DEDUCTIBLE**
Subject to Paragraphs A. and B. of this Clause V., the most the **insurer** shall pay for any **pollution incident** is the Pollution Incident Limit of Liability applicable under the operative Coverage Section set forth in item 7. of the Declarations. In the event that any **pollution incident** gives rise to coverage under multiple Coverage Sections under this Policy, only the highest such applicable Pollution Incident Deductible shall apply; and the most the **insurer** shall pay for such **pollution incident** is the highest such applicable Pollution Incident Limit of Liability.

## CLAUSE VI.   **OTHER INSURANCE**

If other valid and collectible insurance is available for any **pollution incident, claim**, **possible claim**, **loss**, **crisis cost**,

ASPEN04476

**supplementary payment** or legal expense (or any other factor or matter asserted as giving rise to coverage under this Policy), the **insurer's** obligations are as follows:

## A.   PRIMARY INSURANCE

Except as provided in Paragraph B. of this Clause VI., this insurance is primary. The **insurer's** obligations as primary insurer are not affected: (i) solely as respects any **additional insured**, by any other primary insurance and the **insurer** will not seek contribution from any other insurance available to such **additional insureds**; or (ii) as respects any **insured**, unless any of the other insurance is also primary.  In the event of (ii), the **insurer** will share with all other primary insurance as follows:  (a) if all of the other insurance permits contribution by equal shares, the **insurer** will follow such method also whereby each **insurer** contributes equal amounts until it has paid its applicable limit of insurance or none of the **loss** remains, whichever comes first; or (b) if any of the other insurance does not permit contribution by equal shares, the **insurer** will contribute by limits whereby each **insurer's** share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## B.   EXCESS INSURANCE

This Paragraph B. applies solely as respects any coverage provided by the **insurer** on an excess basis as provided in Clause I. of this Policy.  Then, this insurance shall apply only as excess over any other valid and collectible indemnity or insurance, whether such indemnity or insurance is stated to be primary, excess, contingent or otherwise.  Likewise, this insurance shall apply only as excess over any indemnity or insurance pursuant to which any other party or insurer has a duty to provide a defense or defend a **claim** for which this Policy may be obligated to pay **loss, crisis cost** or **supplementary payment**.

## CLAUSE VII.   CANCELLATION

A.   The **first named insured** may cancel this Policy by delivering advanced written notice of cancellation to the **insurer**. Upon cancellation under this Paragraph A., any unearned premium shall be paid to the **first named insured** calculated on a short rate basis.

B.   The **insurer** may cancel this Policy due to non-payment of premium or Deductible, or fraud or material misrepresentation on the part of the **first named insured** in the **application**, in each instance by providing written notice of cancellation to the **first named insured**.  Any written notice of cancellation for non-payment of premium or fraud or material misrepresentation shall be mailed at least 15 days before the effective date of cancellation; provided in the event of any such fraud or material misrepresentation, the **insurer** retains the right to provide notice that the Policy is void ab initio.  Any written notice of cancellation for non-payment of Deductible shall be mailed at least 90 days before the effective date of cancellation. Upon any cancellation under this Paragraph B., any unearned premium shall be paid to the **first named insured** calculated on a pro rata basis.

C.   Any unearned premium due upon cancellation shall be tendered to the **first named insured** as soon as practicable after cancellation, but tender of such unearned premium is not a condition of cancellation.

D.   Any written notice of cancellation provided under Paragraphs A. or B. of this Clause VII. shall state the effective date of cancellation and accordingly the **policy period** will end on such date.  If the written notice does not state such effective date, the effective date shall be the date of such notice was mailed.

## CLAUSE VIII.   CONDITIONS

**Assignment**
Assignment of this Policy, or any of the **insured's** rights or duties hereunder, shall not bind the **insurer** unless and until the **insurer's** written consent is endorsed hereto.

**Bankruptcy**
Bankruptcy or insolvency of the **insured** or the **insured's** estate will not relieve the **insurer** of any obligations under this Policy.  Notwithstanding the foregoing, it is hereby understood and agreed that the **insurer** shall have full rights as a party in interest under 11 U.S.C §1109(b) or similar law to object to any proposal or other matters directly or indirectly affecting this Policy or rights created hereunder.  In the event of bankruptcy or insolvency of the **insured** or the **insured's** estate, such **insured** shall not propose or support reorganization, or otherwise propose or support any provision or any claims resolution facilities that would alter, restrict, modify or in any way affect the **insurer's** rights, duties or obligations under this Policy.

**ASPER110 0212**

Copyright, Aspen Specialty, 2011
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

**Page 7 of 13**

ASPEN04477

**Changes**

This Policy contains all the agreements between the **insurer** and the **insured** concerning the insurance afforded under this Policy. The **first named insured** shall be the only **insured** authorized to request or negotiate changes in the terms of this Policy and the consent of any other **insured** to any such changes shall not be required in connection therewith; provided this Policy's terms cannot be changed, amended or waived except by an endorsement issued by the **insurer** and made a part of this Policy.

**Consent**

Where consent of the **insurer** or the **insured** is required under this Policy, such consent shall not be unreasonably withheld, delayed, conditioned or denied.

**Cooperation**

The **insured** shall provide the **insurer** with cooperation, assistance and information as the **insurer** may request.  If the **insurer** is prohibited under applicable law from investigating, defending or settling any matter falling or potentially falling under the coverage of this Policy, the **insured** shall, under the **insurer's** supervision, arrange for such investigation and defense thereof as is reasonably necessary, and subject to the **insurer's** prior authorization, shall effect such settlement thereof. Further, the **insured** shall assist the **insurer**, upon request, in the enforcement of any right against any person or organization which may be liable to the **insured** because of injury or damage to which this insurance may also apply. Additionally, the **insured** shall provide the **insurer** with access to any information developed or discovered by an **insured** concerning any **pollution condition**, or **imminent** threat thereof, **claim**, **possible claim**, **loss**, **crisis cost**, legal expense, or **supplementary payment** subject to coverage under this Policy, whether or not deemed by an **insured** to be relevant.  Also, the **insured** shall provide access to interview any **insured** and review any documents of the **insured**.

**Coverage Territory**

This Policy shall apply to any covered **pollution condition** that takes place anywhere in the world if permissible under applicable local law, provided the **insurer's** obligation to provide any coverage whatsoever or to make any payment of any nature to anyone under this Policy shall be determined only by a court in the United States of America, its territories or possessions or Canada.  Judgments against the **insurer** may be enforced only in the United States of America.  In no event shall this insurance be used as evidence of financial assurance in any jurisdiction outside of the United States of America.

**Economic and Trade Sanctions**

Any coverage under this Policy in violation of any United States of America economic or trade sanctions, including but not limited to, sanctions administered and enforced by the United States Treasury Department's Office of Foreign Assets Control, shall be null and void.

**Legal Action Against Insurer**

No third-party shall have the right under this Policy to join the **insurer** or any **insured** as a party, or otherwise bring either, into any action against or in opposition to one another.  Further, the **insured** shall have no right under this Policy to bring any action against the **insurer** in connection with this Policy, unless as a condition precedent thereto, such **insured** is and remains in full compliance with all terms of this Policy.

**Notices**

Notwithstanding any other provision of this Policy, all notices required or listed under this Policy: (i) shall include the Policy number identified in Item 2. of the Declarations and be made in writing and mailed to the applicable address identified in Item 8. of the Declarations (proof of mailing for any notice required under this Policy to such applicable addresses will be sufficient proof of notice under this Policy); (ii) received during any applicable Extended Reporting Period and otherwise in accordance with the requirements of Clause III. of this Policy shall be deemed received within the **policy period**; and (iii) provided to any agent or knowledge possessed by an agent or to any other person other than the **insurer** shall not satisfy those notice requirements to the **insurer**, shall not constitute a waiver of notice, estop the **insurer** from asserting any rights, or effect any changes to this Policy.

**Liability and Payments**

No **insured** will, except at that **insured's** own cost, admit liability or voluntarily make a payment, assume any obligation, make any settlement or incur any expense, other than **emergency response cost** or **crisis cost**, without the **insurer's** prior written consent.

**Representations**

By acceptance of this Policy, the **insured** hereby represents that the **application** and any other supplemental materials submitted to the **insurer** are accurate and complete. Further, the **insured** understands and agrees that: (i) such

ASPER110 0212                    Copyright, Aspen Specialty, 2011                    **Page 8 of 13**
                    Includes copyrighted material of Insurance Services Office, Inc.,
                    with its permission.

ASPEN04478

**application** and supplemental materials are material to the underwriting of this Policy; and (ii) the **insurer** issued this Policy in reliance upon such representation, the **application**, supplemental materials and any other material statements made to the **insurer**.

### Separation of Insureds

Except as provided in Clause VII. of this Policy, or as respects the Limits of Liability or any rights or duties specifically assigned in this Policy to the **first named insured**, this Policy applies as if each **insured** were the only **insured** and applies separately to each **insured** against whom a **claim** is made. Accordingly, any "wrongful act" (meaning any misrepresentation, concealment, breach of a term or condition, or violation of any duty under this Policy) by one **insured** shall not prejudice the interest of, or coverage for, another **insured**, except any "wrongful act" of any **insured** who is a parent, subsidiary or affiliate of the **first named insured** shall be imputed to the **first named insured**. Nonetheless, the **insurer** shall have the right to limit, cancel or exclude coverage for any particular **insured** arising from such **insured's** own "wrongful act."

### Service of Suit

Subject to the Legal Action Against Insurer Condition in this Clause VIII., in the event of failure of the **insurer** to pay any amount claimed to be due hereunder, the **insurer**, at the request of the **insured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes a waiver of the **insurer's** right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon counsel at the notice address provided in Item 8.c. of the Declarations. Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the **insurer** hereby designates the Superintendent, Commissioner, Director of Insurance, or other officer specified for that purpose in the statute, or his or her successors in office as its true and lawful agent upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of an **insured** or any beneficiary arising out of this Policy.

### Subrogation

If the **insured** has any right to recover all or part of any payment by the **insurer** under this Policy, such right is hereby transferred to the **insurer** and the **insured** shall not do anything to impair such rights. At the request of the **insurer**, the **insured** will bring suit or take any action to effectuate transfer of such rights to the **insurer** and help the **insurer** enforce such rights. Any amounts so recovered by the **insurer** shall be allocated: (i) first to the expenses incurred in such recovery efforts and proceedings, proportioned in accordance with each interested party's share in the total recovery; (ii) then to the **insured** to the extent of its paid Deductible and its payments in excess of the limit of coverage; and (iii) last to the **insurer** to the extent of its payment under this Policy.

### CLAUSE IX.   DEFINITIONS

**Additional insured** means any person or entity: (i) which the **insured** has agreed to include in coverage under this Policy pursuant to a written contract executed prior to **loss** or **claim**; or (ii) specifically listed on the Schedule of Additional Insureds Endorsement, if any, as attached to and made part of this Policy.

**Aggregate limit of liability** means the amount set forth in Item 6. of the Declarations. Such amount is the most the **insurer** will pay for all **loss** under this Policy. Once such amount has been exhausted, all duties and obligations of the **insurer**, including, but not limited to, the duty to provide any defense under this Policy shall cease.

**Application** means all applications, including any attachments, other materials provided therewith or incorporated or referenced therein (including any transfer of warranty) submitted by or on behalf of the **insured** in connection with the underwriting of this Policy or for any other policy of which this Policy is a renewal, replacement or which it succeeds in time. All **applications**, attachments and materials are deemed attached to, incorporated into and made part of this Policy.

**Approved acquisition standard** means the **insured's** receipt of an ASTM E1527-05 (or any amendments thereto or subsequent versions thereof) compliant report identifying no Recognized Environmental Conditions, except for the presence of an **Underground Storage Tank** which is not known or reported to be leaking and which is reported to be operated and maintained in accordance with all applicable **environmental law**, related to the subject property. Such ASTM compliant report must be based on an environmental survey conducted no earlier than 90 days prior to the date of acquisition of the subject property by the **named insured**.

**Biological Agent** means any microorganism (including, but not limited to, bacteria, viruses, rickettsia, or protozoa) or

ASPEN04479

infectious substance, or naturally occurring, bioengineered, or synthesized component of any such microorganism or infectious substance capable of causing: (i) death, disease, or other biological malfunction in a human, an animal, a plant, or another living organism; (ii) degradation of food, water, equipment, supplies, or other material of any kind; or (iii) deleterious alteration of the environment.

**Bodily injury** means physical injury, sickness, building related illness, mental anguish, shock or emotional distress or disease sustained by a person, including death resulting therefrom. **Bodily injury** also includes medical monitoring cost when accompanied by physical injury.

**Business interruption cost** means the **insured's**: (i) **mandated evacuation cost**, but solely for the **mandated evacuation** of an **insured location**; (ii) lost net profit or loss before income taxes that would have been earned or incurred but for the **business interruption period**; (iii) continuing normal operating and payroll expenses, except for payroll expenses of officers, executives, department managers and employees under contract; (iv) cost to rent temporary premises to replace that portion of the **insured location** that cannot be used for the normal business operations during the **business interruption period**; provided such cost shall not exceed the fair rental value of any such portion; and (v) other reasonable and necessary cost incurred directly due to the **business interruption** and to avoid, mitigate or minimize the **business interruption period**, but only to the extent these expenses actually reduce **loss** otherwise covered under this Policy. **Business interruption cost** is limited to cost incurred during the **business interruption period**. Calculation of **business interruption cost** shall be adjusted downward by the **insurer** to account for non-resumption of any portion of standard business operation that is or was practicable by making use of any portion of the **insured location** or other premises.

**Business interruption period** means the reasonably necessary time period: (i) beginning on the date of the necessary suspension of the **insured's** operations at an **insured location** caused directly by a **pollution condition**, on, at or under an **insured location** resulting in **clean-up cost**; and (ii) ending on the date of resumption of standard business operations at the **insured location** or the date when the **insured** reasonably could have resumed such operations (whether at the **insured location** or another feasible location), whichever occurs first. **Business interruption period** does not include any time period resulting from delay in resuming standard business operations because of interference by any third-party or the **insured**, including any of its employees.

**Claim** means a written or oral demand seeking a remedy and alleging liability or responsibility on the part of the **insured**.

**Clean-up cost** means reasonable and necessary expense incurred with the **insurer's** prior written consent, including legal expense and **restoration cost**, to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of contaminated soil, surface water or groundwater or other contamination caused by a **pollution condition** but only: (i) to the extent required by **environmental law,** required to satisfy a **voluntary clean-up program**, or, in the absence of applicable **environmental law**, as determined reasonable and necessary by an **environmental professional**; or (ii) for cost incurred by any governmental entity of the United States of America including its territories and possessions or Canada or by a third-party; provided however reasonable and necessary expense incurred under this item (ii) may be incurred without the **insurer's** prior written consent but only if and to the extent such expense was incurred by such governmental entity without advance notice to the **insured** or reasonable opportunity for the **insured** to consent to, agree to, comment upon, or object to such expense.

**Covered operation** means activity performed for a third-party for a fee by or on behalf of the **insured** at any job site that is not located on or at any **insured location**. **Covered operation** does not include **transportation**.

**Crisis cost** means reasonable and necessary expense, including legal expense and **restoration cost**, incurred by the **insured** for **crisis services** performed in the event of an **environmental crisis** within the first 21 days following the subject **environmental crisis** for: (i) **mandated evacuation cost**; (ii) mitigation of the **insured's** liability for mass tort; (iii) **business interruption cost**; or (iv) mitigation of adverse media against the **insured**. **Crisis Cost** does not include **emergency response cost**.

**Crisis services** means services performed in response to an **environmental crisis** by a firm listed in the Schedule of Crisis Management Firms, if any, as attached to this Policy or by any similar firm selected by the **insured** with the **insurer's** prior written consent.

**Emergency response cost** means reasonable and necessary cost, charge or expense, including legal expense and **restoration cost,** incurred by the **insured** during the **policy period**: (i) to abate or respond to an **imminent** threat to human health or the environment; or (ii) when failure to act would significantly increase covered **clean-up cost**.

Copyright, Aspen Specialty, 2011
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

ASPEN04480

**Environmental crisis** means an event that results, or would result in the absence of **crisis services** or emergency response action in the good faith judgment of an **executive officer**, in one or more of the following: (i) **emergency response cost**; (ii) **mandated evacuation cost**; (iii) likelihood of the **insured's** liability for mass tort; (iv) **business interruption cost**; or (v) adverse media against the **insured**.

**Environmental damage** means physical damage to soil, the atmosphere, any watercourse or body of water including groundwater, or plant or animal life, caused by any **pollution condition** giving rise to **clean-up cost**. **Environmental damage** does not include **property damage**.

**Environmental law** means any federal, state, provincial, municipal or other local law, statute, ordinance, rule, guidance document, regulation, administrative order or directive and any amendments thereto, including any **voluntary clean-up program** or risk-based corrective action guidance.

**Environmental professional** means a person or entity competent and qualified to address the subject **pollution condition**, as mutually agreed upon by the **insured** and the **insurer** and approved in writing by the **insurer**.

**Executive officer** means a person holding any of the officer positions created by the **insured** in its charter, constitution, by-laws or any other similar governing document or any equivalent position should the **insured** have no officers.

**Expiration date** means set forth in Item 3.(b.) of the Declarations.

**First named insured** means the entity named in Item 1. of the Declarations, which entity shall act on behalf of any other **insureds** for the payment or return of premium and Deductibles, negotiation, receipt and acceptance of any endorsement issued by the **insurer** and made part of this Policy, giving or receiving notice of cancellation, or exercising the right to an Extended Reported Period pursuant to Clause IV. of this Policy.

**Green up-grade cost** means reasonable cost to replace damaged material with environmentally superior material serving the same purpose, as certified by an independent qualified certifying body. If such certification is not available, cost for such environmentally superior material must be approved in advance in writing by, and in the sole discretion of, the **insurer**.

**Imminent** means reasonably probable to occur immediately or very soon, and in any event during the **policy period**.

**Inception date** means the inception date set forth in Item 3.a. of the Declarations.

**Insured** means: (i) the **first named insured**; (ii) the **named insured**; and (iii) and any past or present director, officer, partner, member, manager, or employee, including any **executive officer** or temporary, leased or volunteer employee, while acting within the scope of his or her respective duties as such for either (i) or (ii). **Insured** does not include any **additional insured**.

**Insured contract** means any contract scheduled in the Schedule of Insured Contracts Endorsement, if any, as attached to and made part of this Policy.

**Insured location** means real property owned or managed by or rented or leased by the **insured**: (i) as of the **inception date**; or (ii) first acquired after the **inception date** (a) provided such property was so acquired in accordance with **approved acquisition standard**, (b) subject to the **insurer's** receipt of notice of such acquisition within 90 days of the effective date of such acquisition, and (c) contingent upon payment of the additional premium at the pre-determined rates provided in the Acquired Properties Endorsement, if any, as attached to and made part of this Policy**.**

**Insurer** means the entity set forth in Item 8.c. of the Declarations.

**Loss** means, under the applicable coverage grants: (i) monetary awards or settlements of compensatory damages for **bodily injury**, **property damage** or **environmental damage**; (ii) where allowable by law, punitive, exemplary, or multiple damages, and civil fines, penalties, or assessments for **bodily injury**, **property damage** or **environmental damage**; (iii) **clean-up cost**; (iv) **emergency response cost**; (v) **business interruption cost**; (vi) **green up-grade cost**; (vii) **microbial matter prevention cost**; (viii) **property devaluation**; and (ix) all reasonable and necessary legal expenses, except for **supplementary payment**. All **loss** erodes the **aggregate limit of liability**. **Loss** does not include **crisis cost** or **supplementary payment**.

**Mandated evacuation** means the written order of any governmental authority with applicable jurisdiction requiring the

ASPER110 0212

Copyright, Aspen Specialty, 2011
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

Page 11of 13

ASPEN04481

evacuation or relocation of any person or business from their primary place of abode or primary business location due to a **pollution condition** or **imminent** threat thereof that is subject to coverage under this Policy.

**Mandated evacuation cost** means the reasonable and necessary cost for any **mandated evacuation**.

**Microbial matter** means fungi, mold, yeast, bacteria or viruses including any spores, mycotoxins, or by-products produced or released, which reproduce through the splitting of cells or by any other means, whether or not such matter is living or is mildew.

**Microbial matter prevention cost** means reasonable and necessary expense, including **restoration cost**, incurred during the **policy period** to prevent **microbial matter** following the first discovery of water intrusion at an **insured location**, provided such water intrusion is addressed in accordance with the **insured's** Microbial Matter Operations and Maintenance plan on file with the **insurer**.  In the event that a **pollution condition** arises from such water intrusion, then any **clean-up cost** shall be reduced by the **insurer** by the amount incurred for the subject **microbial matter prevention cost**.

**Misdelivery** means the delivery of any liquid product into any receptacle or to any address other than the correct liquid to the correct receptacle at the correct address.  Correctness under this Definition means matching the  intention of the party ordering such delivery pursuant to a written order or written contract.

**Named insured** means any entity listed on the Schedule of Named Insureds, if any, as attached to this Policy.

**Nanotechnology matter** means any engineered matter or particle, or any engineering process involving such matter or particle, utilized, existing or occurring and purposefully manufactured with one or more external dimensions, or an internal structure, at the "nanoscale" ("nanoscale" means having one or more dimensions of the order of 100 nanometers or less) and behaving as a whole unit in terms of transport and properties.  **Nanotechnology matter** does not include carbohydrates, nucleic acids, or proteins.

**Natural resource damage** means physical injury to or destruction of, including the resulting loss of value of, land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.), any state, local or provincial government, any foreign government, any Native American tribe, or, if such resources are subject to a trust restriction on alienation, any member of a Native American tribe).

**Non-owned site** means any premises that were never owned, occupied, rented, managed, operated or loaned by, to or on behalf of any **insured** or any subsidiary or affiliate thereof.  **Non-owned site** does not include any premises that is (at the time of shipment or **transportation** or other conveyance of waste or during **covered operations** or otherwise utilized by the **insured** for waste treatment, storage, or disposal): (i) not licensed by the appropriate state or federal authority to perform storage, disposal, processing or treatment of waste from the **insured's** operation in compliance with **environmental law**; or (ii) subject to a consent order or corrective action under **environmental law** or is listed or proposed to be listed on the National Priorities List (NPL).

**Policy period** means the period of time set forth in Item 3. of the Declarations, except if this Policy is cancelled in accordance with Clause VII. of this Policy, then the **policy period** ends on the effective date of such cancellation.

**Pollutant** means any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation smoke, vapors, soot, silt, sediment, fumes, acids, alkalis, chemicals, hazardous substances, petroleum hydrocarbons, low level radioactive matter or waste, **microbial matter**, legionella pneumophila, medical, infectious or pathological waste or waste materials, methamphetamines, electromagnetic fields, **biological agent**  or **nanotechnology matter** (but only to the extent such **nanotechnology matter's** existence, use or process is known by the **insured** and affirmatively disclosed in the **application**).

**Pollution condition** means the discharge, emission, seepage, migration, dispersal, **misdelivery**, release or escape, or illicit abandonment by a third-party into the **insured's** consent of any **pollutant** into or upon land, or any structure on land, the atmosphere or any watercourse or body of water including groundwater, provided such **pollutant** is not naturally present in the environment in the concentration or amounts discovered.

**Pollution incident** means the same, related or continuous **pollution condition**, including any **imminent** threat thereof.

**ASPER110 0212**                 Copyright, Aspen Specialty, 2011                          **Page 12 of 13**
                        Includes copyrighted material of Insurance Services Office, Inc.,
                        with its permission.

ASPEN04482

**Possible claim** means a **pollution condition** which: (i) first commenced on or after the **inception date**; (ii) is reported in accordance with Clause III. of this Policy; (iii) and did not result in the **insurer's** obligation to provide any coverage or make any payments under any provision of this Policy.

**Property damage** means: (i) physical injury to or destruction of tangible property (of parties other than an **insured**) including all resulting loss of use and diminished value of such property; (ii) loss of use of tangible property (of parties other than an **insured**) that is not physically injured or destroyed arising out of physical injury to or destruction of other tangible property; and (iii) **natural resource damage**. **Property damage** does not include **clean-up cost**. Tangible property, as such term is used in this Definition, does not include electronic data, information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**Property devaluation** means the difference in value between: (i) the appraisal value (as assessed by a licensed real estate professional reasonably experienced in the community of the **insured location**) of the **insured location** without any deductions from such value as a result of the subject **pollution condition** resulting in **clean-up cost**; and (ii) the actual reasonable sale price received by the **insured** upon closing the sale of such **insured location**, which closing must conclude during the **policy period**. Any **property devaluation** shall be solely limited to the difference in value directly attributable to the subject **pollution condition** as determined by an **environmental professional**. Any foreclosure of an **insured location** shall not constitute a "sale" hereunder.

**Responsible insured** means any **insured's** manager or supervisor responsible for environmental affairs, control or compliance.

**Restoration cost** means reasonable and necessary expense incurred by the **insured** with the **insurer's** prior written consent to repair or replace damaged real or personal property, when such damage occurs during the course of incurring covered **clean-up cost**, **microbial matter prevention cost**, **emergency response cost** or **crisis cost**, regardless of whether such damage to such real or personal property is caused by a **pollution condition**. **Restoration cost** shall not exceed the replacement cost of such real or personal property. Further, except for **green up-grade cost**, repair or replacement in kind or quality exceeding that of the real or personal property before it was damaged, whether at the **insured's** option or not, are betterment costs that are not included in **restoration cost** and shall be incurred at the sole expense of the **insured**.

**Supplementary payment** means actual loss of earnings and reasonable personal and travel expense up to $500 per day incurred by the **insured** to attend a hearing, deposition or trial at the written request of the **insurer**, or to respond to a subpoena for records related to the defense of a **claim**; provided the maximum amount the **insurer** will pay for all such expenses for the **insured's** attendance at any one hearing, deposition, trial, disciplinary proceeding or subpoena response for any one **claim** shall not exceed $10,000.

**Transportation** means the movement by the **insured**, or by a third-party carrier on behalf of the **insured** properly licensed to conduct such movement, from the point of origin until delivery to the final destination of goods, product, merchandise, supplies or waste in an automobile, railcar, train, watercraft or aircraft (including any attached machinery or equipment) (collectively "conveyance") only when such conveyance is properly designed, licensed, registered and subject to insurance (where required by law) for such movement and travel. **Transportation** includes the carrier's loading or un-loading of goods, products, merchandise, supplies or waste into, onto or from any conveyance listed above.

**Underground storage tank** means any one tank or combination of tanks, including underground pipes attached thereto, that has at least 10% of its volume below ground surface if outdoors or below floor if indoors. **Underground storage tank** does not include septic tanks, sump pumps, oil-water separators, storm-water or wastewater collection systems.

**Voluntary clean-up program** means a program, of the United States, or any state thereof, enacted pursuant to **environmental law**, which requires governmental or quasi-governmental written approval or authorization to conduct voluntary remedial action for the clean-up, removal or remediation of a **pollution condition** that exceeds actionable levels established pursuant to **environmental law**.

Copyright, Aspen Specialty, 2011
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

ASPEN04483

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY
ENVIRONMENTAL FOLLOW FORM COVERAGE POLICY
CONTRACTORS POLLUTION LEGAL LIABILITY
ENVIRONMENTAL IMPAIRMENT POLLUTION LEGAL LIABILITY
ENVIRONMENTAL LEGAL LIABILITY POLICY
CONTRACTORS POLLUTION POLICY OCCURRENCE INCURRED
CONTRACTORS PROFESSIONAL PROTECTIVE POLLUTION POLICY
COMMERCIAL GENERAL LIABILITY & ENVIRONMENTAL EXPOSURE POLICY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**ASPER098 1211**

Copyright, Aspen Specialty, 2011
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**Page 1 of 1**

ASPEN04484

IL 09 85 01 08

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE
TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS
ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND
CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

| | |
|---|---|
| Terrorism Premium (Certified Acts) | $1,581 |

This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):

Additional information, if any, concerning the terrorism premium:

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

IL 09 85 01 08 © ISO Properties, Inc., 2007 Page 1 of 1

ASPEN04485

**POLICY NUMBER:** ERACG7E13

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## MANUSCRIPT ENDORSEMENT
### DESIGNATED POLLUTION CONDITIONS EXCLUSION
### BODILY INJURY AND PROPERTY DAMAGE EXCEPTION
### NFA CLAUSE ENDORSEMENT

This endorsement modifies insurance provided under the following:
POLICY NUMBER: ERACG7E13

It is hereby agreed the following Exclusion is added under CLAUSE II:

**Designated Pollution Conditions**

Any **pollution condition** due to tetrachloroethylene (PCE), trichloroethylene (TCE), 1,2-Dichloroethene (1,2-DCE), vinyl chloride or total petroleum hydrocarbons including any additives to or degradation by-products thereof, at, under or migrating from or through the **insured location**.  However, this Exclusion does not apply to **bodily injury** or **property damage**.

In the sole discretion of the **insurer**, this Exclusion may be amended upon the **insurer's** receipt and satisfactory review and approval of a Certificate of Closure, No Further Action Letter, or equivalent documentation issued by the responsible governmental agency with applicable jurisdiction. Provided, no such amendment shall apply unless and until provided in a written endorsement issued by the **insurer**, but in no event shall any amendment apply to any **pollution condition** that commences prior to the effective date of such endorsement.

All other terms and conditions of this Policy remain unchanged.

**ASPER117 0112**                                                    **Page 1  of 1**

ASPEN04486

**POLICY NUMBER:** ERACG7E13

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## MANUSCRIPT ENDORSEMENT
### DEWATERING ACTIVITIES EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:
POLICY NUMBER: ERACG7E13

It is hereby agreed that the following Exclusion is added to CLAUSE II. **EXCLUSIONS**:

**Dewatering**
The management, treatment or disposal of groundwater in connection with any dewatering activities on, at, or under the **insured location** pursuant to any development plan for the **insured location**.  However, this Exclusion does not apply to **bodily injury** or **property damage**.

In the sole discretion of the **insurer**, this Exclusion may be amended upon the **insurer's** receipt and satisfactory review and approval of a Certificate of Occupancy issued by the responsible governmental agency with applicable jurisdiction. Provided, no such amendment shall apply unless and until provided in a written endorsement issued by the **insurer**, but in no event shall any amendment apply to any **pollution condition** that commences prior to the effective date of such endorsement.

All other terms and conditions of this Policy remain unchanged.

**ASPER117 0112**                                                              **Page  1  of  1**

ASPEN04487

**POLICY NUMBER:** ERACG7E13

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## MANUSCRIPT ENDORSEMENT

### MICROBIAL MATTER COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:
POLICY NUMBER: ERACG7E13

It is hereby agreed that the following is added to the end of CLAUSE IX. **DEFINITIONS**, **Pollution Condition**:

Provided, however, that any **pollution condition** related to, associated with or due to **microbial matter** must occur on or after the date of any Certificate of Occupancy issued by the responsible governmental agency with applicable jurisdiction.

All other terms and conditions of this Policy remain unchanged.

**ASPER117 0112**                                                                  **Page 1  of 1**

ASPEN04488

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AGGREGATE DEDUCTIBLE & EACH INCIDENT MAINTENANCE DEDUCTIBLE

In consideration of the premium charged, the Policy and Declarations are amended as follows:

1. Item 7. of the Declarations is amended by addition of the following at the end thereof:

   Aggregate Policy Deductible: $350,000

   Each Pollution Incident Maintenance Deductible: $25,000

2. The following Paragraph is added under CLAUSE V:

   D. **AGGREGATE DEDUCTIBLE AND EACH INCIDENT MAINTENANCE DEDUCTIBLE**
   Subject to Paragraphs B. and C. of this Section, once the **insured** pays the Aggregate Policy Deductible amount set forth in Item 7. of the Declarations as amended in Paragraph 1. above in this Endorsement, the applicable Pollution Incident Deductible will no longer apply, and each **loss** will instead be subject to an Each Pollution Incident Maintenance Deductible amount set forth in Item 7. of the Declarations as amended in Paragraph 1. of this Endorsement.

All other terms and conditions of this Policy remain unchanged.

**ASPER149 0612** **Page 1 of 1**

ASPEN04489

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DISCLOSED DOCUMENTS ENDORSEMENT

In consideration of the premium charged, for the purposes of the Prior Knowledge and Non-Disclosure Exclusion under Clause II., the **insurer** acknowledges receipt of the documents listed below. **Pollution conditions** identified in these documents are deemed disclosed to the **insurer** provided all other Exclusions applicable to such **pollution conditions** still apply and are not amended, altered or changed by this Endorsement.

| Author | Document | Date |
|---|---|---|
| ENGEO INCORPORATED | Geotechnical Exploration, 1500 Newell Avenue, Walnut Creek, California | April 16, 2013 |
| Versar, Inc. | Phase I Environmental Site Assessment 1305-1335 S. Main Street, 1500 Newell Avenue, Walnut Creek, California | May 3, 2006 |
| Versar, Inc. | Phase 2 Environmental Site Assessment Properties at 1305 through 1345 South Main Street, Walnut Creek, California | May 9, 2006 |

All other terms and conditions of this Policy remain unchanged.

**ASPER154 1012**                                                              **Page 1 of 1**

ASPEN04490

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## MATERIAL CHANGE IN USE EXCLUSION

It is hereby agreed the following is added to Clause II., **Exclusions**:

**Material Change In Use**

A change in use of any **insured location** that is materially different from the Intended Use described below:

Intended Use:

"podium style," multi-story, commercial/residential structure with underground parking

All other terms and conditions of this Policy remain unchanged.

**ASPER162 0612**                                                                 **Page 1 of 1**

ASPEN04491

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## MINIMUM EARNED PREMIUM ENDORSEMENT

It is hereby agreed the Policy is amended by deleting Paragraphs A. and B. under CLAUSE VII. in their entirety and replacing them with the following:

A.   The First Named Insured may cancel this Policy by delivering advanced written notice of cancellation to the **insurer**. Upon cancellation under this Paragraph A., any unearned premium shall be paid to the such insured calculated on a short rate basis after applying the minimum premium earned scheduled below in this Endorsement.

B.   The **insurer** may cancel this Policy due to non-payment of premium or Deductible, or fraud or material misrepresentation on the part of the First Named Insured in the **application**, in each instance by providing written notice of cancellation to the First Named Insured.  Any written notice of cancellation for non-payment of premium or fraud or material misrepresentation shall be mailed at least 15 days before the effective date of cancellation; provided in the event of any such fraud or material misrepresentation, the insurer retains the right to provide notice that the Policy is void ab initio. Any written notice of cancellation for non-payment of Deductible shall be mailed at least 90 days before the effective date of cancellation. Upon any cancellation under this Paragraph B., any unearned premium shall be paid to the First Named Insured calculated on a pro rata basis after applying the minimum premium scheduled below in this Endorsement.

Scheduled Minimum Earned Premium

| | |
|---|---|
| 50% | of the total premium set forth in the Declarations shall be earned as of the **inception date**. |
| 100% | of the total premium set forth in the Declaration shall be earned as of the first anniversary of the **inception date**. |
| | |
| | |

All other terms and conditions of this Policy remain unchanged.

**ASPER164 1012**                                                                                      **Page 1 of 1**

ASPEN04492

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SCHEDULE OF INSURED LOCATION(S)

It is hereby agreed Clause IX., **Definitions**, **insured location**, is deleted in its entirety and replaced with the following:

**Insured location** means only those locations appearing on the following schedule:

Schedule

1305 – 1334 South Main Street
Walnut Creek, CA 94596
(Assessor's Parcel Number: 184-070-002)

1500 Newell Avenue
Walnut Creek, CA 94596
(Assessor's Parcel Numbers: 184-070-001, 184-070-003 & 184-070-004)

All other terms and conditions of this Policy remain unchanged.

**ASPER170 1012**                                                                                      **Page 1 of 1**

ASPEN04493

# Exhibit 2



APPROXIMATE SITE
BOUNDARY

Source: USGS, TerraServer, 2004.





0          50 yards
APPROXIMATE SCALE

| Dr. By:  JI | **Versar** NC | **SITE AERIAL PHOTOGRAPH** |  |
|---|---|---|---|
| Date:   04/28/06 | 7844 Madison Avenue<br>Suite 167<br>Fair Oaks, CA 95628<br>(916) 962-1612 | **Walnut Creek Parcels**<br>**1305-1335 S Main Street**<br>**1500 Newell Avenue** | **Figure**<br>**2** |
| Versar Project No.:5071.105 | | **Walnut Creek, California** | |

Path/File:  P/Essex/Belmont/Walnut Creek/f2

ESSEX009795

**Exhibit 3**

$483,400
22%
211 tiebacks

NEWELL VILLAGE

1500 Newell Ave
Walnut Creek, CA

TEMPORARY
EXCAVATION
SHORING
DESIGN

General Contractor:

S.D.
DEACON
CORPORATION

Subcontractor:

RJS
CONSTRUCTION
INC.

SPI CONSULTING
ENGINEERS, INC.
931 DEWING AVENUE
SUITE D
LAFAYETTE, CA 94549

TEL: (925) 299-1541
FAX: (925) 299-1544

## GENERAL REQUIREMENTS

## SPECIAL INSPECTION & OBSERVATION

## GEOTECHNICAL DESIGN PARAMETERS

## CONCRETE

## STEEL

## LAGGING

## SOLDIER BEAMS INSTALLATION PROCEDURE

### SOLDIER BEAM SCHEDULE

| Beam Number | Qty (each) | Type | Maximum "H" Above Subgrade (ft.) | Toe Embedment (ft.) | Beam Size (Wxx) |
|---|---|---|---|---|---|
| 1 – 4 | 4 | I Level Tieback | 24.5 | 13.4 | W 14 x 48 |
| 5 – 20 | 16 | I Level Tieback | 24.5 | 13.5 | W 14 x 48 |
| 21 – 46 | 26 | I Level Tieback | 24.5 | 13.5 | W 14 x 48 |
| 47 – 80 | 34 | I Level Tieback | 24.5 | 9.0 | W 14 x 43 |
| 81 – 89 | 9 | I Level Tieback | 24.5 | 22.5 | W 14 x 53 |
| 90 – 109 | 20 | I Level Tieback | 18.9 | 8.0 | W 14 x 48 |
| 110 – 139 | 18 | 2 Level Tieback | 31.5 | 11.9 | W 14 x 82 |
| 140 – 161 | 22 | 2 Level Tieback | 33.5 | 12.3 | W 14 x 90 |
| 162 – 172 | 11 | Cantilever Beam | 7.0 | 14.0 | W 14 x 53 |

### TIEBACK SCHEDULE

| Beam Number | Level | Qty (each) | Tieback Elevation | Drilled Angle (degrees) | Design Load (kips) | Wire Size (each) | Unbond Length (ft.) | Tension Length (ft.) | # of 0.6" Strands (each) | Maximum Elongation (in.) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 – 4 | 1 | 4 | 5.2 below 315 | 30 | 129 | 162 | 15 | 4 | 0.47 |
| 5 – 20 | 1 | 16 | 9.7 below 316 | 30 | 121 | 132 | 15 | 4 | 0.47 |
| 21 – 46 | 1 | 26 | 9.7 below 317 | 30 | 121 | 144 | 15 | 4 | 0.47 |
| 47 – 80 | 1 | 34 | 9.7 below 318 | 30 | 112 | 144 | 15 | 4 | 0.47 |
| 81 – 89 | 1 | 9 | 14.0 | 30 | 127 | 158 | 15 | 4 | 0.47 |
| 90 – 109 | 1 | 20 | 15.6 | 30 | 83 | 160 | 15 | 3 | 0.64 |
| 110 – 139 | 1 | 18 | 10.0 | 30 | 72 | 162 | 15 | 3 | 0.64 |
| 110 – 139 | 2 | 18 | 25.0 | 30 | 108 | 136 | 15 | 4 | 0.73 |
| 140 – 161 | 1 | 22 | 7.5 below 315 | 30 | 68 | 156 | 15 | 3 | 0.64 |
| 140 – 161 | 2 | 22 | 19.1 | 45 | 93 | 138 | 15 | 3 | 0.83 |
| 162 – 172 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

PROJECT

LOCATION MAP

## SCOPE OF WORK

AS PART OF THE NEWELL VILLAGE DEVELOPMENT
PROJECT IN WALNUT CREEK AN EXCAVATION UP TO
24-FEET BELOW EXISTING GRADE IS REQUIRED.
THESE DRAWINGS ADDRESS THE TEMPORARY
SHORING REQUIREMENTS FOR THAT EXCAVATION. A
SYSTEM OF DRIVEN SOLDIER BEAMS WITH WOOD
LAGGING AND TIEBACKS WILL BE USED TO RETAIN
THESE CUTS.

### INDEX OF DRAWINGS

SH-1    NOTES, LOCATION MAP, SCHEDULES AND INDEX
SH-2    SHORING PLAN DESIGN
SH-2A   SHORING PLAN DESIGN
SH-3    SHORING ELEVATIONS
SH-4    SHORING ELEVATIONS
SH-5    SHORING SECTIONS AND DETAILS
SH-6    SHORING SECTIONS AND DETAILS
SH-7    SHORING SECTIONS
SH-8    SHORING SECTIONS
SH-9    SHORING SECTIONS
SH-10   SHORING SECTIONS



Project Number
1845

DATE: JUNE 7, 2013

NOTES,
SCHEDULES,
SCOPE OF
WORK AND
INDEX

SH-1

ESSEX000271



NEWELL
VILLAGE

1500 Newell Ave
Walnut Creek, CA

TEMPORARY
EXCAVATION
SHORING
DESIGN

General Contractor:

S.D.
DEACON
CORPORATION

Subcontractor:

RJS
CONSTRUCTION
INC.

SPI CONSULTING
ENGINEERS, INC.
971 DEWING AVENUE
SUITE 201
LAFAYETTE, CA. 94549
TEL: (925) 299-1341
FAX: (925) 299-1346

Project Number        Scale
1845              AS NOTED
Drawn by     Checked by
AB            SJ

DATE: JUNE 7, 2013

SHORING
PLAN
DESIGN

SH-2

## SHORING PLAN DESIGN
SCALE: 3/32" = 1'-0"

NORTH

### LEGEND
SOLDIER BEAM # = (#) I SOLDIER BEAMS

FILTRATION ZONE

DEWATERING TANK
SUPPORT SLAB &
PILES. SEE 3/SH-8

(E) BOLLARDS
(VIF)

(E) CULVERT

ESSEX000272



NEWELL
VILLAGE

1500 Newell Ave
Walnut Creek, CA.

TEMPORARY
EXCAVATION
SHORING
DESIGN

General Contractor:

S.D.
DEACON
CORPORATION

Subcontractor:

RJS
CONSTRUCTION
INC.

SPI CONSULTING
ENGINEERS, INC.
971 DEWING AVENUE
SUITE 201
LAFAYETTE, CA. 94549
TEL: (925) 299-1341
FAX: (925) 299-1346

DATE: JUNE 7, 2013

SHORING
PLAN
DESIGN

SH-2A

## SHORING PLAN DESIGN
SCALE: 3/32" = 1'-0"

LEGEND

SOLDIER BEAM    I SOLDIER BEAMS

ESSEX000273



NEWELL
VILLAGE

1500 Newell Ave
Walnut Creek, CA

TEMPORARY
EXCAVATION
SHORING
DESIGN

General Contractor:

S.D.
DEACON
CORPORATION

Subcontractor:

RJS
CONSTRUCTION
INC.

SPI CONSULTING
ENGINEERS, INC.
973 DEWING AVENUE
SUITE 201
LAFAYETTE,CA. 94549
TEL: (925) 299-1341
FAX: (925) 299-1346

Project Number          Scale
5845              AS NOTED
Drawn by      Checked by
AG                  SJ

DATE: JUNE 7, 2013

SHORING
ELEVATIONS

SH-3

① SHORING ELEVATION
SCALE: 1/8" = 1'-0"

② SHORING ELEVATION
SCALE: 1/8" = 1'-0"

③ SHORING ELEVATION
SCALE: 1/8" = 1'-0"

④ SHORING ELEVATION
SCALE: 1/8" = 1'-0"

LEGEND
TOS=TOP OF STEEL
SG=SUBGRADE (BOTTOM OF
EXCAVATION)
■ TIEBACK
◇ SURVEY MONITORING POINT
AT TOP OF ALL SOLDIER BEAMS(TYP.)

ESSEX000274



ESSEX000275



| Beam Number | Distance from Face of Shoring to PL (ft.) | Maximum Tieback Length (ft.) | Maximum Bonded Length (ft.) |
|---|---|---|---|
| 83 | 59.83 | 69.00 | 33.59 |
| 84 | 55.92 | 64.50 | 49.00 |
| 85 | 52.42 | 60.50 | 45.00 |
| 86 | 49.08 | 56.50 | 41.00 |
| 87 | 45.75 | 72.75 | 37.25 |

**TYPICAL SECTION** SOLDIER BEAMS 1-82  SCALE: 1/8" = 1'-0"

**SECTION @ S.B. # 87** (#83-86 SIM.)  SCALE: 1/8" = 1'-0"

TYPICAL SOLDIER BEAM

SECTION

PLAN DETAIL @ CORNER BEAMS
BEAMS 44, 92, 112, 124, 133, 140, 147, 150 & 156

TYPICAL CORNER LAGGING DETAIL

TIEBACK SECTION  NTS

TIE POCKET DETAIL  NTS

NEWELL VILLAGE

1500 Newell Ave
Walnut Creek, CA

TEMPORARY EXCAVATION SHORING DESIGN

General Contractor:
S.D. DEACON CORPORATION

Subcontractor:
RJS CONSTRUCTION INC.

SPI CONSULTING ENGINEERS, INC.
971 DEWING AVENUE
SUITE 201
LAFAYETTE CA, 94549
TEL: (925) 299-1341
FAX: (925) 299-1346

Project Number    Scale
3845              AS NOTED
Drawn by    Checked by
AB          SJ

DATE: JUNE 7, 2013

SECTIONS AND DETAILS

SH-5

ESSEX000276



NEWELL
VILLAGE

1500 Newell Ave
Walnut Creek, CA

TEMPORARY
EXCAVATION
SHORING
DESIGN

General Contractor:

S.D.
DEACON
CORPORATION

Subcontractor:

RJS
CONSTRUCTION
INC.

SPI CONSULTING
ENGINEERS, INC.
971 DEWING AVENUE
SUITE 201
LAFAYETTE,CA. 94549
TEL: (925) 299-1341
FAX: (925) 299-1346

Project Number        Scale
1845              AS NOTED
Drawn by          Checked by
AB                SJ

DATE: JUNE 7, 2013

SECTIONS
DETAIL
AND
TABLE

SH-6

| Beam Number | Distance from Face of Shoring in PL (ft.) | Maximum Tieback Length (ft.) | Maximum Bonded Length (ft.) |
|---|---|---|---|
| 88 | 42.33 | 48.75 | 33.25 |
| 89 | 39.00 | 45.00 | 29.50 |
| 90 | 35.67 | 50.25 | 34.75 |
| 91 | 32.33 | 45.50 | 30.00 |
| 92 | 26.83 | 37.75 | 22.25 |
| 93 | 27.58 | 39.00 | 23.50 |
| 94 | 29.33 | 40.00 | 24.50 |
| 95 | 23.08 | 41.00 | 28.50 |
| 96 | 29.83 | 42.00 | 28.50 |
| 97 | 30.50 | 41.00 | 27.50 |
| 98 | 31.25 | 44.00 | 28.50 |
| 99 | 32.00 | 45.25 | 29.75 |
| 100 | 32.75 | 46.25 | 30.75 |
| 101 | 33.50 | 47.25 | 31.75 |
| 102 | 34.17 | 48.25 | 32.75 |
| 103 | 33.42 | 47.25 | 31.75 |
| 104 | 32.33 | 45.50 | 30.00 |
| 105 | 31.17 | 44.00 | 28.50 |
| 106 | 30.08 | 42.50 | 27.00 |
| 107 | 28.92 | 40.75 | 25.25 |
| 108 | 27.83 | 39.25 | 23.75 |
| 109 | 26.67 | 37.50 | 22.00 |
| 110 | 25.50 | 36.00 | 20.50 |

ESSEX000277



NEWELL
VILLAGE

1500 Newell Ave
Walnut Creek, CA

TEMPORARY
EXCAVATION
SHORING
DESIGN

General Contractor:

S.D.
DEACON
CORPORATION

Subcontractor:

RJS
CONSTRUCTION
INC.

SPI CONSULTING
ENGINEERS, INC.
971 DEWING AVENUE
SUITE 201
LAFAYETTE,CA. 94549
TEL: (925) 299-1341
FAX: (925) 299-1346

Project Number    Scale
1945              AS NOTED
Drawn by    Checked by
AH          S

DATE: JUNE 7, 2013

SECTIONS

SH-7

| Beam Number | Distance from Face of Shoring to PL (ft.) | Maximum Tieback Length (ft.) | Maximum Bonded Length (ft.) |
|---|---|---|---|
| 111 | 24.42 | 34.50 | 19.00 |
| 112 | 25.58 | 16.00 | 20.50 |
| 113 | 24.25 | 34.25 | 18.75 |

ESSEX000278



NEWELL
VILLAGE

1500 Newell Ave
Walnut Creek, CA

TEMPORARY
EXCAVATION
SHORING
DESIGN

General Contractor:

S.D.
DEACON
CORPORATION

Subcontractor:

RJS
CONSTRUCTION
INC.

SPI CONSULTING
ENGINEERS, INC.

971 DEWING AVENUE
SUITE 201
LAFAYETTE, CA. 94549
TEL: (925) 299-1341
FAX: (925) 299-1346

DRIVEN PILES & SLAB DETAIL

SECTION @ SB. #127
(#125-129 SIM.)
SCALE: 1/2" = 1'-0"

SECTION @ SB. #116
(#114-124 SIM.)
SCALE: 1/2" = 1'-0"

| Beam Number | Distance from Face of Shoring to PL (ft.) | Maximum Tieback Length (ft.) | Maximum Bonded Length (ft.) |
|---|---|---|---|
| 113 | 24.25 | 34.25 | 18.75 |
| 114 | 24.08 | 34.00 | 18.50 |
| 115 | 23.83 | 33.50 | 18.00 |
| 116 | 23.58 | 33.25 | 17.75 |
| 117 | 23.42 | 33.00 | 17.50 |
| 118 | 23.17 | 32.75 | 17.25 |
| 119 | 23.00 | 32.50 | 17.00 |
| 120 | 22.75 | 32.00 | 16.50 |
| 121 | 22.50 | 31.75 | 16.25 |
| 122 | 22.33 | 31.50 | 16.00 |
| 123 | 30.42 | 43.00 | 27.50 |
| 124 | 45.17 | 63.75 | 48.25 |
| 125 | 56.75 | 80.25 | 64.75 |
| 126 | 39.83 | 56.25 | 40.75 |
| 127 | 33.58 | 47.25 | 31.75 |
| 128 | 34.42 | 48.50 | 33.00 |
| 129 | 35.42 | 50.00 | 34.50 |

Project Number 1845

Drawn By
AB
Scale
AS NOTED
Checked by
TD

DATE: JUNE 7, 2013

SECTIONS

SH-8

ESSEX000279



NEWELL
VILLAGE

1500 Newell Ave
Walnut Creek, CA

TEMPORARY
EXCAVATION
SHORING
DESIGN

General Contractor:

S.D.
DEACON
CORPORATION

Subcontractor:

RJS
CONSTRUCTION
INC.

SPI CONSULTING
ENGINEERS, INC.
971 DEWING AVENUE
SUITE 203
LAFAYETTE, CA. 94549
TEL: (925) 299-1341
FAX: (925) 299-1346

Project Number        Scale
JMG                   AS NOTED
Drawn by    Checked by
AE            JJ

DATE: JUNE 7, 2013

SECTIONS

SH-9

SECTION @ SB. # 131
(#130-137 SIM.)
SCALE: 1/4" = 1'-0"

SECTION @ SB. # 138
(#139 SIM.)
SCALE: 1/4" = 1'-0"

| Beam Number | Distance from Face of Shoring to PL (ft.) | Maximum Tieback Length (ft.) | Maximum Bonded Length (ft.) |
|---|---|---|---|
| 130 | 16.42 | 51.30 | 39.00 |
| 131 | 37.42 | 52.75 | 37.25 |
| 132 | 36.43 | 51.50 | 36.00 |
| 133 | 29.59 | 41.75 | 20.25 |
| 134 | 31.92 | 43.00 | 29.50 |
| 135 | 33.75 | 47.30 | 32.00 |
| 136 | 35.38 | 50.00 | 34.50 |
| 137 | 37.25 | 52.50 | 37.00 |
| 138 | 39.00 | 55.00 | 39.50 |
| 139 | 40.75 | 57.50 | 42.00 |

ESSEX000280



NEWELL VILLAGE

1500 Newell Ave
Walnut Creek, CA

TEMPORARY EXCAVATION SHORING DESIGN

General Contractor:
S.D. DEACON CORPORATION

Subcontractor:
RJS CONSTRUCTION INC.

SPI CONSULTING ENGINEERS, INC.
971 DEWING AVENUE
SUITE 203
LAFAYETTE, CA. 94549
TEL: (925) 299-1341
FAX: (925) 299-1346

| # | Date | Revision/Issue |
|---|------|----------------|
| △ | 4-8-2013 | DESIGN NEWELL |
| △ | 6-8-2013 | DESIGN NEWELL |

Project Number: 1045    Scale: AS NOTED
Drawn by: AS    Checked by: SJ

DATE: JUNE 7, 2013

SECTIONS

SH-10

SECTION @ SE. H 144
(#140-151 SIM.)    SCALE: ⅛" = 1'-0"

SECTION @ 152-161
(#152-161 SIM.)    SCALE: ⅛" = 1'-0"

| Beam Number | Distance from Face of Shoring to P.L. (ft.) | Maximum Tieback Length (ft.) | Maximum Bonded Length (ft.) |
|---|---|---|---|
| 140 | 57.67 | 81.50 | 66.00 |
| 141 | 56.08 | 79.25 | 63.75 |
| 142 | 55.25 | 78.00 | 62.50 |
| 143 | 54.42 | 76.75 | 61.25 |
| 144 | 53.58 | 75.75 | 60.25 |
| 145 | 52.83 | 74.50 | 59.00 |
| 146 | 52.00 | 73.50 | 58.00 |
| 147 | 51.25 | 72.25 | 56.75 |
| 148 | 63.08 | 89.00 | 73.50 |
| 149 | 67.50 | 95.25 | 79.75 |
| 150 | 69.42 | 98.00 | 82.50 |
| 151 | N/A | N/A | N/A |
| 152 | 62.17 | 87.75 | 72.25 |
| 153 | 66.25 | 93.50 | 78.00 |
| 154 | 70.33 | 99.25 | 83.75 |
| 155 | 51.92 | 73.25 | 57.75 |
| 156 | 69.33 | 98.00 | 82.50 |
| 157 | 88.33 | 124.75 | 109.25 |
| 158 | 92.42 | 130.50 | 115.00 |
| 159 | 96.42 | 136.25 | 120.75 |
| 160 | 100.50 | 142.00 | 126.50 |
| 161 | 104.58 | 147.75 | 132.25 |

ESSEX000281

**Exhibit 4**



# 1500 NEWELL AVE.
## ENVIRONMENTAL SURVEY
WALNUT CREEK, CONTRA COSTA COUNTY, CALIFORNIA
NOV. 22, 2013

**VICINITY MAP**
NOT TO SCALE

**GRAPHIC SCALE**
( IN FEET )
1 inch = 40 ft.

**LEGEND**

| | |
|---|---|
| BOUNDARY | |
| LEAD BASED CONTAMINANT | (PROVIDED BY VERSAR) |
| HYDROCARBON CONTAMINANT | (PROVIDED BY VERSAR) |
| DEBRIS CONTAMINANT | (PROVIDED BY VERSAR) |
| CONTAMINANT ELEVATION | (PROVIDED BY VERSAR) |
| 133.6/126.8 | BOTTOM NOT DETERMINED |
| 133.6/ | CONTAMINANT ELEVATION (LOCATED BY SURVEY) |
| 133.6/ | BOTTOM NOT DETERMINED (PROVIDED BY VERSAR) |
| | I-BEAMS (LOCATION NUMBER) |

**CONSULTING**

**SHEET 1 OF 1**

ESSEX002050

# Exhibit 5

A S P E N
ASPEN SPECIALTY

December 13, 2013

**Via email:** bbain@essexpropertytrust.com

Bill Bain
Essex Walnut Owner LP
925 E Meadow Drive
Palo Alto CA 94303

Re:    **Named Insured:** Essex Walnut Owner LP
       **Insured Location:** 1500 Newell Avenue, Walnut Creek CA
       **Policy No.:** ERACG7E13
       **Policy Period:** 09/06/2013 – 09/06/2018

*tort law, and otherwise*

Dear Mr. Bain:

Aspen Specialty is the claim administrator on behalf of Aspen American Insurance Company ("Aspen"). Aspen issued an Environmental Legal Liability policy to Essex Walnut Owner LP under Aspen Policy No. ERACG7E13 (the "Policy"). Aspen is in receipt of your 10/29/2013 Notice of Claim advising of the discovery of pollutants in the soils at the 1500 Newell Avenue, Walnut Creek California site.   At this time, we are still conducting our coverage investigation and cannot confirm to you whether coverage is available for this potential claim. *without limitation* *and extra-contractual damages.*

However, due to the time constraints involved in disposing of the contaminated soils and if you are agreeable, we can offer the following interim arrangement while we are completing our investigation. Aspen will agree to allow you to proceed with the appropriate disposal of the contaminated soils pursuant to the regulatory requirements.  Under this arrangement, Aspen would fully reserve all of our rights under the Policy, including our right to deny coverage. Likewise, Essex Walnut Owner would fully reserve all of your rights under Policy, including your right to seek coverage.  If coverage is available to you, expenses and costs incurred during this interim arrangement would be subject to ~~your~~ *any* applicable ~~$50,000 per pollution incident deductible and $350,000 aggregate~~ deductible, *as provided in the Policy,* ~~and which you would be required to pay before Aspen will be required to pay covered costs or expenses.  If coverage is not available to you, all defense costs and expenses incurred would be your sole responsibility for payment.~~ *Notwithstanding anything to the contrary, nothing herein is intended to reduce or absolve Aspen of any of its duties.*

If the above-described arrangement is acceptable to you, please sign this letter in the space provided below to evidence your agreement.  If we ultimately determine that clean-up coverage is available to

Aspen Specialty 590 Madison Ave. 7 Floor, New York, NY 10022 T: (646) 289-4929

ASPEN06875

*please be advised that*

you, we will only recognize reasonable and necessary costs and expenses incurred by you subject to the terms of Policy, including your applicable deductible, and we would also generally reserve all of our rights under the Policy including any applicable rights to withhold written consent.

¶4

This correspondence and its contents in no way constitute, nor should be considered, a relinquishment by Aspen of any defenses available to it under the terms and conditions of the Policy, and nothing in this letter nor any act of Aspen on or before the date of this letter should be considered as an estoppel or waiver of any known or unknown defenses. Aspen reserves the right to rely upon any additional defenses, as they become known, and to either limit or deny coverage. Likewise, this correspondence and its contents in no way constitute, nor should be considered, a relinquishment by any insured of any rights it has under the terms and conditions of the Policy, and nothing in this letter should be considered as an estoppel or waiver of any claim available to any insured. *In addition, nothing herein is intended to alter the terms of the Policy, which shall govern and control over any contrary provisions herein.*

Very truly yours,

*Tim Polevoy*

Jon S. Polevoy
Sr. Claims Examiner
Aspen Specialty
590 Madison Avenue
New York, NY 10022
T: (646) 289-4929
E-mail: Jon.Polevoy@aspen-insurance.com

Agreed, *as to ¶2 and ¶4 only*

**Legal Owner:**

Essex Walnut Owner, L.P.,
a California limited partnership

By:    Essex Walnut GP, L.P.,
        a Delaware limited partnership,
        its general partner

        By:    Essex Management Corporation,
                a California corporation,
                its general partner

                By:
                Its:   EVP

cc:    via email: LFiller@essexpropertytrust.com
        Les Filler
        Essex Property Trust, LLC

Aspen Specialty 590 Madison Ave. 7 Floor, New York, NY 10022 T: (646) 289-4929

ASPEN06876