UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESSEX WALNUT OWNER L.P., <br><br> Plaintiff, <br><br> v. <br><br> ASPEN SPECIALTY INSURANCE COMPANY, <br><br> Defendant. | Case No. 17-cv-06435-EMC <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT** <br><br> Docket Nos. 27, 29 |

Plaintiff Essex Walnut Owner L.P. purchased an insurance policy – an Environmental Legal Liability Policy – from Defendant Aspen Specialty Insurance Company. *See* Jt. Undisp. Fact ¶ 1. The policy covered a certain site in Walnut Creek where Essex intended to demolish existing structures and build a new, mixed-use development. *See* Jt. Undisp. Fact ¶¶ 4-6. As part of this project, Essex had to do some excavation in the site. During excavation, Essex discovered debris within part of the site (the "Excavated Area") – more specifically, wood, concrete, glass, metal, tires, and large, buried tree trunks. *See* Jt. Undisp. Fact ¶¶ 11-12. Essex had that debris removed. The parties reached a settlement regarding the cost to Essex of removing the debris. The instant case concerns whether, under the insurance policy, Aspen should have paid for other costs incurred by Essex related to the site – in particular, costs incurred in re-designing a new shoring system allegedly necessitated by the debris outside the Excavated Area.

Currently pending before the Court is Aspen's motion for summary judgment and Essex's motion for partial summary judgment. Having considered the parties briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Aspen's motion and **DENIES** Essex's motion.

## I.     FACTUAL & PROCEDURAL BACKGROUND

As noted above, Essex purchased an insurance policy titled "Environmental Legal Liability Policy" from Aspen. The critical provisions of the policy are as follows:

- The policy provided coverage for "**[c]lean-up cost** incurred by the insured resulting from a **pollution condition** on, at, under, or migrating from or through an insured location." Policy ¶ 1(a) (some bold omitted).[1]

- "**Pollution condition** means the discharge, emission, seepage, migration, dispersal, misdelivery, release or escape, or illicit abandonment by a third-party without the insured's consent of any **pollutant** into or upon land, or any structure on land, the atmosphere or any watercourse or body of water including groundwater, provided such **pollutant** is not naturally present in the environment in the concentration or amounts discovered." Policy at 13 (some bold omitted).

- "**Pollutant** means any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation smoke, vapors, soot, silt, sediment, fumes, acids, alkalis, chemicals, hazardous substances, petroleum hydrocarbons, low level radioactive matter or waste, microbial matter, legionella pneumophila, medical, infectious or pathological waste or waste materials, methamphetamines, electromagnetic fields, biological agent or nanotechnology matter . . . ." Policy at 13 (some bold omitted).

- "**Clean-up cost** means reasonable and necessary expense incurred with the insurer's prior written consent, including legal expense and **restoration cost**, to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of contaminated soil, surface water or groundwater or other contamination caused by a **pollution condition** but only: (i) to the extent required by environmental law, required to satisfy a voluntary clean-up program, or, in the absence of applicable environmental law, as determined reasonable and necessary by an environmental

---

[1] Throughout this order, the Court has left in bold only those terms that are relevant to the pending motions.

2

1  professional; or (ii) for cost incurred by any governmental entity of the United
States of America including its territories and possessions or Canada or by a third-
party; provided however reasonable and necessary expense incurred under this item
(ii) may be incurred without the insurer's prior written consent but only if and to
the extent such expense was incurred by such governmental entity without advance
notice to the insured or reasonable opportunity for the insured to consent to, agree
to, comment upon, or object to such expense." Policy at 10 (some bold omitted).

- "**Restoration cost** means reasonable and necessary expense incurred by the insured with the insurer's prior written consent to repair or replace damaged real or personal property, when such damage occurs during the course of incurring covered **clean-up cost**, microbial matter prevention cost, emergency response cost or crisis cost, regardless of whether such damage to such real or personal property is caused by a **pollution condition**." Policy at 13 (some bold omitted).

Essex obtained the insurance policy for a site where it intended to build a new, mixed-use development. *See* Jt. Undisp. Fact ¶¶ 4-5. Prior to demolition and construction, the site consisted of small retail shops, small office buildings, and a paved parking lot. *See* Docket No. 32-1 (Bain Decl. ¶ 3).[2] It also appears that a gas station previously operated at the site. *See* Docket No. 32-1 (Bain Decl. ¶ 3). Essex's plan was "create a mixed residential and commercial use development with underground parking two levels below grade." Docket No. 32-1 (Bain Decl. ¶ 3).

As part of the project, excavation was required, and Essex had a temporary shoring system designed for it "to protect the integrity of the excavation, as well as to stabilize the area outside of excavation." Docket No. 32-2 (Berger Decl. ¶ 3); *see also* Jt. Undisp. Fact ¶ 6 (stating that Essex had a "shoring system" designed for it "as part of the planned construction and mixed-use development at the Site"); Docket No. 32-1 (Bain Decl. ¶ 5) (testifying that ENGEO, the company Essex hired to do a geotechnical report for the site, "recommended temporary shoring to facilitate construction of the underground parking and development"). The temporary shoring system

---

[2] Aspen has objected to certain testimony contained in the Bain declaration. Where there are relevant objections, they are so noted.

3

"consisted of retaining walls anchored by 'tie backs' drilled at a downward angle into soil outside the retaining walls." Jt. Undisp. Fact ¶ 7.

During excavation, Essex discovered debris buried in the Excavated Area. *See* Jt. Undisp. Fact ¶ 11. "The debris consisted of wood, concrete, glass, metal, tires, and large, buried tree trunks." Jt. Undisp. Fact ¶ 12. Essex ultimately had that debris removed and, as noted above, the parties reached a settlement regarding the cost of removing the debris from the Excavated Area.

The dispute between the parties is related to the area *outside* of the Excavated Area. Essex maintains that (1) there is debris outside of the Excavated Area and that (2) the debris outside of the Excavated Area caused certain tie-backs of the shoring system to fail. The tie-backs that failed were anchored into soil outside of the Excavated Area. *See* Jt. Undisp. Fact ¶ 20. According to Aspen, there is no evidence or insufficient evidence of debris outside of the Excavated Area.[3] *See, e.g.*, Jt. Undisp. Fact ¶ 21 ("Soil samples were not collected or tested from the area outside the Excavated Area in which the failing tie backs were anchored.").

Essex has not asked Aspen to cover the cost of removing any debris from outside of the Excavated Area. *See* Jt. Undisp. Fact ¶ 18. Instead, Essex has asked Aspen to cover the cost of re-designing the shoring system on the theory that the debris outside of the Excavated Area, where the tie backs were anchored, caused the tie backs to fail, thus necessitating a re-design in the shoring system.

Essex has asserted the following claims for relief: declaratory relief, breach of contract, and bad faith.

**II.     DISCUSSION**

A.    Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

---

[3] However, discussed *infra*, the parties are not asking the Court to make a ruling on summary judgment as to whether there is debris in the area outside the Excavated Area.

4

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

In the instant case, Aspen is moving for summary judgment based on two issues: (1) that debris is not a "pollutant" under the policy and (2) that the cost of re-designing the shoring system is not a "clean-up cost" under the policy. Essex is moving for partial summary judgment on two issues: (1) that debris is a "pollutant" under the policy and (2) that a "pollution condition" as defined by the policy existed.

As indicated by the above, the parties' summary judgment motions call upon the Court to interpret the insurance policy. "[I]nterpretation of an insurance policy is a question of law." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 18 (1995). Contract interpretation, as a question of law, is often amenable to summary judgment, *see LaGrassa v. Burlington Ins. Co.*, No. 11-CV-2730-JAM-EFB, 2012 U.S. Dist. LEXIS 168263, at *8 (E.D. Cal. Nov. 26, 2012), although "[s]ummary judgment may be inappropriate in a contract case if there is a dispute over a material fact necessary to interpret the contract." *United Pac. Ins. Co. v. Kilroy Indus.*, 608 F. Supp. 847, 850 (C.D. Cal. 1985).

B.  Contract Interpretation

"While insurance contracts have special features," the California Supreme Court has emphasized that "they are still contracts to which the ordinary rules of contractual interpretation apply." *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992).

> The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. The court must look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. In searching for a plain meaning, a court is to interpret the language of an agreement in its "ordinary and popular sense, unless used by the parties in a technical sense." A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. Language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be

5

United States District Court
Northern District of California

> ambiguous in the abstract. Courts will not strain to create an ambiguity where none exists.
>
> Thus, if possible, intent is determined solely from the written provisions of the insurance policy. If the policy language is clear and explicit, it governs. However, if this "plain meaning" approach fails to resolve the ambiguities, a court is to look at the objectively reasonable expectations of the policy holder. Finally, if the "reasonable expectations" approach does not resolve the ambiguity, the ambiguity is to be interpreted against the drafter (the insurer), since that party caused the ambiguities to exist.

*Perez-Encinas v. Amerus Life Ins. Co.*, 468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006); *see also Bank of the W.*, 2 Cal. 4th 1254, 1264-65 (providing the same basic overview).

The California Supreme Court has noted that not only do courts generally resolve ambiguities in favor of coverage but they also "generally interpret the coverage clauses of insurance policies broadly, [in order to protect] the objectively reasonable expectations of the insured." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 667 (1995).

C.  Pollutant

The first issue for the Court to decide is whether debris constitutes a "pollutant" under the policy.[4] This issue has been raised in both parties' motions.[5]

As an initial matter, the Court takes into account that it is not clear that there is any debris in the area outside the Excavated Area – or at least Aspen maintains that there is no evidence of insufficient evidence of debris. If there is a genuine dispute of material fact as to whether there is debris in the area outside of the Excavated Area, then that would ordinarily preclude summary judgment in favor of either party. However, neither party is asking the Court to make a determination on summary judgment as to whether there is in fact debris in the area outside the Excavated Area. Rather, Aspen argues that, even assuming there is debris outside of the

---

[4] The Court **GRANTS** Essex's motion to supplement the record, *see* Docket No. 37 (motion), which is related to the issue of what "pollutant" means for purposes of the policy. The Court also **GRANTS** Aspen's alternative motion to file a reply to Essex's motion to supplement (as well as a reply to Essex's response to Aspen's evidentiary objections). *See* Docket No. 38 (motion).

[5] The Court notes that, according to Essex, it cannot adequately respond to Aspen's motion for summary judgment because Aspen has failed to provide discovery responses related to the "pollutant" issue. But as Aspen points out, this argument has little force given that Essex itself has moved for summary judgment on the "pollutant" issue.

6

1  Excavated Area, debris cannot be a "pollutant" under the insurance policy. In turn, Essex asserts

2  that, assuming there is debris outside of the Excavated Area, debris is a "pollutant" for purposes of

3  the policy.[6]

4  The starting point for whether debris is a "pollutant" is the definition of "pollutant" in the

5  policy at issue. The policy defines "pollutant" as follows:

> **Pollutant** means any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation smoke, vapors, soot, silt, sediment, fumes, acids, alkalis, chemicals, hazardous substances, petroleum hydrocarbons, low level radioactive matter or waste, microbial matter, legionella pneumophila, medical, infectious or pathological waste or waste materials, methamphetamines, electromagnetic fields, biological agent or nanotechnology matter . . . .

Policy at 13 (some bold omitted).

In *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635 (2003), the California Supreme Court considered a policy that had a similar definition for "pollutant," albeit in a pollution exclusion clause rather than, as here, a pollution coverage clause. The California Supreme Court noted that, while "pollutant" was defined in the policy as, *e.g.*, any irritant or contaminant, "[v]irtually any substance can act under the proper circumstances as an 'irritant or contaminant.'" *Id.* at 650. In other words, a broad interpretation of "pollutant" could lead to "absurd results" (*i.e.*, the pollution exclusion clause would exclude just about everything from coverage). *Id.* at 652.

The California Supreme Court focused on how the "ordinary layperson" would understand the term and concluded that, under the "common connotative meaning" of the word, the pollution exclusion clause would be limited to "injuries arising from events *commonly thought of as pollution, i.e., environmental pollution*, [which] also appears to be consistent with the choice of the terms 'discharge, dispersal, release or escape' in the policy." *Id.* at 652-53 (emphasis added). The Court added that this interpretation was consistent with the history behind pollution exclusion clauses, which were "adopted to address the enormous potential liability resulting from antipollution laws enacted between 1966 and 1980." *Id.* (also stating that "[t]he history and

---

[6] Essex's motion (but not Aspen's) somewhat seems to be asking the Court to render an advisory opinion.

7

purpose of the clause, while not determinative, may properly be used by courts as an aid to discern the meaning of disputed policy language").

Unlike *MacKinnon*, which dealt with a pollution exclusion clause, the instant case concerns a pollution coverage clause; this ordinarily would counsel in favor of a broader definition here in the insured's favor. However, the basic teaching of *MacKinnon* – namely, that "pollutant" should be understood to mean something that is commonly thought of as pollution, *i.e.*, environmental pollution – logically applies even in the context of the case at bar. *See Ruffin Rd. Venture Lot IV v. Travelers Prop. Cas. Co. of Am.*, No. 10-CV-11-JM (WVG), 2011 U.S. Dist. LEXIS 66095 (S.D. Cal. June 20, 2011) (in a pollution coverage case, looking to *MacKinnon* for guidance and indicating that a pollutant is something that contaminates a source's natural surroundings). *MacKinnon*'s interpretation comports fully with the title of the insurance policy here – "*Environmental* Legal Liability Policy" (emphasis added). It is also consistent with the examples of "pollutant" provided in the policy (*e.g.*, smoke, hazardous substances) and with other policy provisions; in particular, the policy provides that Aspen will pay for "clean-up cost" which the policy defines as an expense incurred to, *e.g.*, address contamination caused by a pollution condition "to the extent required by *environmental* law" or "as determined reasonable and necessary by an *environmental* professional." Policy at 10 (emphasis added). Since Aspen's liability under the policy is tied to "environmental" matters, it is only logical that "pollutant" likewise be defined as relating to environmental matters.

To the extent Aspen advocates an even more restrictive interpretation of "pollutant" – *i.e.*, something is a "pollutant" only "if it is described as such in environmental law," Def.'s Opp'n at 10 – the Court does not agree. First, as just indicated, Aspen's liability is not limited "to the extent required by environmental law." Moreover, while Aspen has cited cases where courts have made reference to environmental law, those cases have not held that something is a pollutant *only* when it is described as such in environmental law. *See, e.g. Ortega Rock Quarry v. Golden Eagle Ins. Corp.*, 141 Cal. App. 4th 969, 980 (2006) (simply stating that "state and federal environmental laws may provide *insight* into the scope of the policies' definition of pollutants [in an exclusion clause] without being specifically incorporated in those definitions") (emphasis added).

8

Moreover, Aspen's attempt to narrow the *MacKinnon* interpretation of "pollutant" is particularly unwarranted given that the instant case involves a coverage clause, not an exclusion clause. Finally, as Essex points out, if Aspen wanted to so limit "pollutant," it could easily have done so; in contrast to the definition of "clean-up cost" which expressly references "environmental law," "pollutant" makes no such reference.

The question is thus whether the kind of debris allegedly found here in the soil is commonly thought of as environmental pollution. Although it is not clear what kind of debris, if any, is actually in the area outside the Excavated Area, for purposes of this order, the Court assumes that the debris is the same kind of debris as that which was found in the Excavated Area – *i.e.*, wood, concrete, glass, metal, tires, and large, buried tree trunks.

Courts have reached varying conclusions as to whether this kind of debris constitutes environmental pollution. *Compare Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 933 F. Supp. 675, 684 (E.D. Mich. 1996) ("The pollution exclusion clause excludes coverage for 'any' contaminant or irritant. When released into the environment, styrofoam, polystyrene, rubble and debris all constitute contaminants or irritants."), *with Manus v. Ranger Ins. Co.*, 142 F. App'x 280, 282 (9th Cir. 2005) (unpublished decision) ("Given the narrow interpretation of the pollution exclusion in *MacKinnon*, we cannot say that based upon the 'facts known to the insurer at the inception of the suit,' the materials dumped by JV (including dirt, brush, weeds, grapevines, leaves, tree stumps, tree branches, ice plants, sod, concrete, and tires) could only be considered 'contaminants commonly thought of as pollution.' Therefore, the pollution exclusion did not excuse Ranger's duty to defend JV in the underlying lawsuit.").

The policy itself does not provide any additional clarity. For example, while it lists some kinds of waste ("low level radioactive matter or waste" and medical, infectious or pathological waste or waste materials") as "pollutant[s]," it does not necessarily foreclose other kinds of waste; the definition of "pollutant" uses the phrase "including without limitation." Policy at 13. Aspen's invocation of the principle of ejusdem generis is unavailing precisely because "pollutant" was defined in this specific way. In contrast, in *Guam Industrial Services, Inc. v. Zurich American Insurance Co.*, 787 F.3d 1001 (9th Cir. 2015), the principle of ejusdem generis was properly

9

applied because the policy at issue had an endorsement (which, as an exception to a pollution exclusion clause, effectively provided pollution coverage) that provided

> a list of specific substances whose 'discharge, dispersal, release or escape' triggers the clause. The substances listed are "smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes)." These specific substances are *then followed by the catchall terms* "or other irritants, contaminants or pollutants." . . . "It is . . . a familiar canon of statutory construction that [catchall] clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated."

*Id.* at 1006 (emphasis added).

In the instant case, however, the Court need not reach any definitive ruling on the meaning of "pollutant" – or for that matter "pollution condition" (a related issue raised in Essex's motion) – because ultimately the pending motions may be resolved based on the term "clean-up cost."

D.  Clean-Up Cost

Aspen, but not Essex, has asked for summary judgment as to whether the cost of redesigning the temporary shoring system constituted a "clean-up cost" under the policy. As noted above, the following provisions from the policy relate to "clean-up cost."

- "**Clean-up cost** means reasonable and necessary expense incurred with the insurer's prior written consent, including legal expense and **restoration cost**, to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of contaminated soil, surface water or groundwater or other contamination caused by a **pollution condition** . . . ." Policy at 10 (some bold omitted).

- "**Restoration cost** means reasonable and necessary expense incurred by the insured with the insurer's prior written consent to repair or replace damaged real or personal property, when such damage occurs during the course of incurring covered **clean-up cost**, microbial matter prevention cost, emergency response cost or crisis cost, regardless of whether such damage to such real or personal property is caused by a **pollution condition**." Policy at 13 (some bold omitted).

Essex argues that the cost for the redesign of the temporary shoring system is a "clean-up cost" because it was a cost incurred to "contain" or "neutralize" the "contaminated soil" (*i.e.*,

10

contaminated because of the presence of debris). Essex argues that, in the alternative, the cost of the redesign should be considered a "restoration cost."

Essex's arguments lack merit. For purposes of this decision, the Court assumes that the soil was "contaminated" because of the presence of debris in the area outside of Excavated Area. But even with that assumption, the redesigned shoring system neither contained nor neutralized the contaminated soil.

To "contain" environmental pollution is to restrain or control the pollution or to check or halt its spread. *See, e.g.*, https://www.merriam-webster.com/dictionary/contain (last visited August 10, 2018) (defining "contain" as "restrain, control" or "check, halt"). The redesigned shoring system did none of those things. The purpose of the redesigned shoring system was not to contain any environmental pollution but rather to provide structural support as part of the construction. While Essex correctly notes that nothing in the policy states that there is coverage only if the *sole* purpose is to address environmental pollution, that is immaterial because, here, the purpose of the redesigned shoring system had nothing to do with addressing environmental pollution.[7] Indeed, as the Court noted at the hearing, under Essex's reasoning, the foundation ultimately poured would, by the nature of its solid structure, "contain" environmental pollution (by keeping it out of the Excavated Area), but one could hardly expect Aspen to cover the cost of the foundation under an environmental policy. In short, the shoring system was not installed to contain contaminated soil; it functioned structurally to keep soil out of the Excavated Area, soil which happened to be contaminated.

Essex's argument that the redesigned shoring system also "neutralize[d]" the environmental pollution fares no better. Neutralize means, in essence, to make ineffective. *See*

---

[7] That there may be an arguable but-for causation of some kind here – *i.e.*, environmental pollution caused instability which then necessitated redesign of the shoring system – is not enough to establish coverage. While one provision in the policy refers to coverage for "[c]lean-up cost incurred by the insured *resulting from* a pollution condition," Policy ¶ 1(a) (bold omitted; emphasis added), the provision that defines "clean-up cost" makes clear that it is a cost "*to* investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of" environmental pollution. Policy at 10 (emphasis added). For the reasons noted above in discussing the meaning of "pollutant," the containment of contaminated soil must relate to an environmental concern to be covered.

11

https://www.merriam-webster.com/dictionary/neutralize (last visited August 10, 2018) (defining "neutralize" to "to counteract the activity or effect of: make ineffective"). Essex did not neutralize the contamination because Essex left the contamination there; it did not render the contamination any less effective in terms of its impact on the environment. Although the redesign of the shoring system addressed the instability in the soil that was purportedly due to the debris, the revised shoring system neutralized instability, not *contamination* of the soil. Moreover, as Aspen points out, Essex did not even neutralize the instability because it left the debris there; instead Essex simply found a way to avoid the instability purportedly caused by the debris.

To the extent Essex suggests that getting rid of the debris – *i.e.*, physically removing it – would have been too expensive and a redesign was cheaper, *see* Docket No. 32-1 (Bain Decl. ¶ 17) (testifying that, "[e]ven if Essex had access and the ability to excavate the debris affecting the tiebacks, that option was impractical based on the amount of time and much greater costs to achieve the same goal of containing and neutralizing the contaminated soil"), that does not change the Court's analysis. At bottom, Essex incurred costs not because the debris was an environmental pollutant but rather because the debris caused the soil to be structurally less stable.

Finally, Essex protests that, at the very least, the cost of the redesign was a "restoration cost" under the policy. As noted above,

> **[r]estoration cost** means reasonable and necessary expense incurred by the insured with the insurer's prior written consent to repair or replace **damaged real or personal property**, when such damage **occurs during the course** of incurring covered **clean-up cost**, microbial matter prevention cost, emergency response cost or crisis cost, regardless of whether such damage to such real or personal property is caused by a **pollution condition**."

Policy at 13 (some bold omitted). However, the redesign cost is not a restoration cost. There is no "damaged real or personal property." Although Essex claims that the "original shoring system where the tie back system failed" is the "damaged real property that needed to be 'repaired or replaced,'" Pl.'s Opp'n at 15, the original shoring system was not damaged; rather, it was simply ineffective. Also, to be covered as a restoration cost, any damage to property must have occurred "during the course of incurring covered clean-up cost"; Essex has failed to show any such

occurrence.[8]  *See* Def.'s Mot. at 12 (arguing that "Essex cannot identify any clean-up that damaged the tie backs").

### III. CONCLUSION

For the foregoing reasons, the Court grants Aspen's motion for summary judgment.  Even if debris constitutes a "pollutant" under the policy, debatable proposition, Aspen is entitled to summary judgment because, as a matter of law, the cost of redesigning the temporary shoring system is not a "clean-up cost" under the policy.  Because the Court is granting Aspen's motion for summary judgment, Essex's motion for partial summary judgment is denied as moot.

This order disposes of Docket Nos. 27, 29, 37, and 38.

**IT IS SO ORDERED**.

Dated: August 15, 2018

EDWARD M. CHEN
United States District Judge

---

[8] Indeed, there is a definitional quandary by Essex.  If "clean-up cost" were the cost of the new shoring system, how is the shoring system "damaged" during the course of incurring covered "clean-up cost"?

13